UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

THE 81 DEVELOPMENT COMPANY, LLC,
a Michigan limited liability company,

      Plaintiff,

v.

YOUNG, GRAHAM & WENDLING, P.C.,
a Michigan professional corporation,

      Defendant.

File No. 1:19-cv-408
Hon.

_____/

Jonathan R. Moothart (P40678)
Moothart & Sarafa, PLC
Attorneys for Plaintiff
9815 Miami Beach Rd
P.O. Box 243
Williamsburg, MI  49686
231-947-8048
jon@moothartlaw.com

_____/

**COMPLAINT FOR VIOLATION OF 42 U.S.C. §1983
AND CONSPIRACY TO VIOLATE 42 U.S.C. §1983**

**AND JURY DEMAND**

**Parties and Jurisdiction**

1.      The parties to this case are:

a.      Plaintiff, The 81 Development Co., LLC ("The 81"), a Michigan limited liability

company, with its registered office located AT 314 Munson Ave, Traverse City,

Michigan 49686.

b.      Defendant Young, Graham & Wendling, P.C. ("YGW"), a Michigan professional

corporation doing business in Antrim and Grand Traverse County.  According to

documents on file with the Michigan Department of Licensing and Regulatory Affairs, the resident agent for YGW is Bryan E. Graham, 104 E. Forest Home Ave., Bellaire, MI 49615.  Pursuant to MCL 450.1285(3), "A professional corporation is liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, agents, or employees while they are engaged on behalf of the professional corporation in providing professional services." The property of YGW includes without limitation all of its equipment, general intangibles, contract rights, good will, and accounts receivable.  Under Michigan law, "a professional corporation is to be treated exactly as an individual member of the profession."  *Peters v Golds*, 366 F. Supp. 150, 153 (E.D. Mich 1973).

2.      This Court has original jurisdiction of this action because it arises under the Equal Protection Clause of the Constitution of the United States of America, and the laws of the United States, including 42 U.S.C. § 1983.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**Facts Common to All Counts**

3.      Plaintiff ("The 81") owns lands in Peninsula Township, comprising about 81 acres, located at approximately 15634 Smokey Hollow Road and 15636 Bluff Road (the "Property").

4.      On January 5, 2015, The 81 submitted an application to the governing municipality, Peninsula Township, for a special use permit ("SUP") to construct a 41 unit single family site condominium planned unit development ("PUD") on the Property, all as provided by and in accordance with the duly established law of the State of Michigan, including the Michigan Zoning Enabling Act ("MZEA"), and the Peninsula Township Zoning Ordinance ("PTZO").

5.    Review of the application included at least 4 meetings of the Peninsula Township Planning Commission ("PC"), on March 16, 2015, April 20, 2015, May 18, 2015, and June 15, 2015.

6.    The minutes of the May 18, 2015 meeting are attached as **Exhibit 1**.  On page 5 of the minutes, appear the comments of  Mark Nadolski, the President of Protect the Peninsula, a Michigan nonprofit corporation, which included the questions "has an environmental assessment for lead and arsenic been done on this farmland" and whether there were any storage tanks or storage barns for "agri-chemicals" on the property.  Peninsula Township attorney, YGW's Peter Wendling, was in attendance at the meeting.

7.    The May 18, 2015 minutes, p. 5, also reference a letter of Mr. Nadolski also presented to the PC, **Exhibit 2**, which stated, among other things, that "All fruit farms throughout the country have used pesticides that included lead and arsenic in the past.  An independent firm should be hired by the township – at the developer's expense – to do testing of the soils."

8.    Page 6 of the May 18, 2015 minutes, **Exhibit 1**, reflect that commissioner Rogers questioned  "what this development would do to water, soil, air."

9.    The June 15, 2015 PC meeting, (minutes, **Exhibit 3,** p. 12), state "[Commissioner] Rosi said this is an old agricultural parcel asked about contaminated soil.  *Quandt* said it has not been looked at because the larger portion of this property was not farmed.  The portion of the property that was farmed will be graded.  It is not part of the ordinance criteria."

10.    The June 15, 2015 PC minutes, in proposed findings of fact (**Exhibit 3,** p. 17), state in regard to PTZO § 2.1.b.4, that "preservation of the open space is a substantial improvement over other non-PUD development rights as provided in the Peninsula Township Zoning Ordinance . . . ."

3

11.     The June 15, 2015 PC minutes state (**Exhibit 3,** p. 24), in regard to § 8.1.3, section 2.3.k., "[t]hat grading or filling will not destroy the character of the property or the surrounding area, and will not adversely affect the adjacent or neighboring properties," as follows:

i.      The Commission finds that any form of development is going to cause some disturbance on the site.  Regardless, given that development of the parcel is allowed under the Zoning Ordinance under both the R-1A and R-1B Zoning Districts, the PUD as proposed preserves as undeveloped 54.23 acres as open space.  The plan also includes through a small setback, 1500 feet of undeveloped East Grand Traverse Bay waterfront, exclusive of dockage facilities.  As such, given the other options available for development, the plan as presented and as developed, will leave areas undisturbed during construction and afterward as depicted on the site plan and at the site, per se.  (Exhibits 1, 8, 9, 11, 12, 14, 19.2, 19.3, 19.7, 19.9, 19.10, 20, 21, & 22)

ii      The Commission finds that the development of the road appears to be reasonable in the context of the existing topography and existing drainage patterns.  (Exhibit 19)

iii.    The Commission finds that the applicant shall submit a grading plan with sufficient details to evaluate the plan for protection of the steep slopes and vegetation present on the site as requested by the SESC and the Township Engineer.  (Exhibits 11 & 14)

iv.     The Commission finds that the request[ed] SESC permits shall be submitted to the Planning & Zoning Department prior to the issuance of the SUP.

This standard HAS been met.

11.1    Peninsula Township attorney, YGW's Peter Wendling, was in attendance at the meeting, and advised the Peninsula Township Board regarding The 81 PUD that "the Planning Commission had a public hearing on this item and advised the Planning Commission is acting as advisory board only.  The Township Board will have another Public Hearing on this item."

12.     The minutes of the first meeting of the Peninsula Township Board regarding The 81, on July 14, 2015, **Exhibit 4**, page 12, reflect the following comments, including significant contributions regarding environmental matters by YGW's Wendling:

"**Byron** asked about possible contamination on this property and an environmental assessment. **Reardon** said it is her understanding that the property [h]as not been farmed in 30 years. This was discussed at the Planning Commission. There is nothing in the ordinance that the Township could compel an environmental assessment. **Wendling** said it is not a Township issue it is a Health Department issue. **Byron** said the Township is responsible for the health, safety and welfare so it is a Township issue. **Wendling** said yes but that is carried out through provisions in the zoning ordinance. **Byron** said we have been trying to change the zoning ordinance for at least five years now. As a Trustee, Byron has yet to see any revision. Byron does not see how the Township can have a Master Plan and ask the Planning and Zoning Department to enforce the ordinance when it does not support the Master Plan. The Township needs to step back and get the zoning ordinance in line with the Master Plan. It is not fair to our constituents who pay tax dollars to protect open space and farm land and then allow something like this development to happen. *Quandt* said farmed area will be land balanced and that is how to mediate lead arsenic." "There was also discussion about the trees that would be removed."

13. The July 14, 2015 minutes, **Exhibit 4**, p. 15, also reflect Mr. Nadolski, making the same comments as he made at the May 18, 2015 PC meeting, including concerns about lead, arsenic, and storage barns and tanks for "agri-chemicals," and also complaining that the findings of fact presented at the PC "do not reflect the major issues."

14. Also presented to the Board on July 14, 2015 was a letter from Scott Howard, attorney for James Komendera (**Exhibit 5**), in which Attorney Howard stated "In order to highlight the environmental impact of this proposed project, we have retained Dr. Christopher Grobbel to provide an independent analysis of the project plans. As Dr. Grobbel's report indicates, there are numerous environmental concerns with the project. Of particular note is the incredible amount of earthwork proposed in the plan and a high risk for erosion . . . ."

15. At the next meeting of the Peninsula Township Board, and on August 11, 2015, the Board approved the requested SUP/PUD, adopting the findings of the PC, including those set forth above in regarding to subsection (k) regarding adverse impact on neighboring or adjacent properties

from grading.  See **Exhibit 6**, pp. 18-19.  As he was at the prior PC meeting, Peninsula Township

attorney, YGW's Peter Wendling, was in attendance at this meeting.

16.    On page 32 of the August 11, 2015 minutes (**Exhibit 6**), the Peninsula Township

Board established 10 conditions of approval of the SUP/PUD.  Conditions nos. 1 and 6 were:

1.    The Development shall meet adequate safety standards for fire protection subject to the Peninsula Township Fire Department review and approval including the provision of an additional egress for emergency purposes at either Trevor Rd or within The 81 proper.  If provided within The 81 proper Staff shall be allowed to permit a reduction in lot size as warranted and based on the mathematical calculation for open space under the ordinance.  The second egress should it be provided with The 81 proper shall be gravel or paved per review of Peninsula Township Fire Chief.

6.    Detailed grading plans shall be supplied to the Township Engineer for the Township Engineer's review and approval prior to SUP issuance.

17.    Thus, after a thorough review, which included both verbal comment and written

correspondence regarding possible chemical contamination of the soils with lead and arsenic as the

result of agrochemicals in farming operations in the past, and PC and Township Board discussions

regarding this issue, the Township Board unanimously approved The 81's application.  This approval

contained specific findings regarding § 8.1.3.k., at both the PC and Board levels, as set forth above.

18.    Subsequently, Attorney Howard filed an administrative appeal of the Board's August

11, 2015 decision to the Grand Traverse County Circuit Court, on behalf of James Komendera and

Preserve Old Mission Peninsula ("POMP"), a non-profit corporation, the resident agent of which the

records of the State of Michigan reveal is James Komendera, with an address of 1260 Sunnywood

Place, Rochester, Michigan 48306.

19.     In its brief opposing the appeal, Peninsula Township argued vigorously that on August 11, 2015, the Peninsula Township Board "made detailed and proper findings under the standards contained in the Peninsula Township Zoning Ordinance . . . ."

20.     Following briefing and argument, and on January 15, 2016, the Honorable Philip E. Rodgers, Jr. upheld the decision of the Peninsula Township Board as being based upon competent, material and substantial evidence on the record, except with respect to two discrete issues which were remanded to the Township Board for further proceedings and findings regarding the conclusions. **Exhibit 7**.

21.     Judge Rodgers' rulings (**Exhibit 7**) included the following statements affirming various aspects of the Peninsula Township Board's findings:

 a. Opinion, p. 8 – "natural resources will be preserved to the maximum feasible extent," referencing §8.1.3(3)(f).

 b. Opinion p. 7 – uses permitted by right would allow 65 lots, multiple docks on 2500 lineal feet on East Grand Traverse Bay – this SUP has 41 densely clustered units, 54 acres of open space, limited road development and one main dock at the shoreline. "Under the Ordinance, exercising the uses permitted by right would allow considerably more development on the site, which undoubtedly would result in a decrease in open space and significant destruction with respect to grading and deforestation."

 c. Opinion, p. 10 – "open space meets the requirements of Ordinance 8.3.3(5). 8.3.4(4) and 8.3.6."

 d. Opinion, p. 12 – the "objectives" of ordinance have been met.

22.     However, Judge Rodgers did find the Peninsula Township Board's findings deficient, in two very narrow, specific and limited respects.  On page 10 of his opinion, (**Exhibit 7**), Judge Rodgers first quoted two of the conditions (nos. 1 and 6) from the August 11, 2015 Decision and Order:

> (1) The Development shall meet adequate safety standards for fire protection subject to the Peninsula Township Fire Department review and approval including the provision of an additional egress for emergency purposes at either Trevor Road or within The 81 proper.  If provided within The 81 proper staff shall be allowed to permit a reduction in lot size as warranted and based on the mathematical calculation for open space under the ordinance.  The second egress should it be provided with [sic] The 81 proper shall be gravel or paved per review of Peninsula Township Fire Chief.

> (6) Detailed grading plans shall be supplied to the Township Engineer for the Township Engineer's review and approval prior to SUP issuance.

23.     Judge Rodgers also observed (opinion, p. 11 (**Exhibit 7**)) that "[s]imilarly, the Board delegated approval of the grading plan to the Township Engineer."

24.     Judge Rodgers then observed (opinion, p. 11 (**Exhibit 7**)) that "the location for the additional egress for emergency purposes was undecided at the time the Board voted to approve the SUP/PUD."

24.1    Finally, Judge Rodgers stated:

> Reliance on expert/professional recommendations is permitted, so long as a township board independently determines that a proposed PUD meets ordinance requirements. Here, the Board did not "independently determine" that the proposed SUP/PUD met the ordinance requirements because it delegated authority to the Fire Department and the Township Engineer to provide approval on certain zoning standards.  The Court finds that the Board improperly delegated authority to staff and remands this issue for further consideration consistent with this decision and order.

25.     Immediately following the above language, Judge Rodgers added the following, in footnote 46 (**Exhibit 7**):

The Ordinance has required standards relating to soil erosion, grading and stormwater. In its findings and conclusions, the Board indicated that the Developer "shall submit a grading plan with sufficient details to evaluate the plan for protection of steep slopes and vegetation present on site as requested by the SESC and the Township Engineer." Similarly, the Board found that "storm water control review is currently being contemplated by the Township Engineer and the site shall comply fully with the requirements of the Storm Water Control Ordinance." These statements are not legally sufficient findings to support a conclusion that the standards for soil erosion, grading and storm water have been met and the Court remands these issues for further consideration by the Board.

26.     In his conclusion, Judge Rodgers summarized the ruling (opinion, p. 16 (**Exhibit 7**)):

In conclusion, the Court finds that the Board lawfully exercised its discretion under the Ordinance when it determined that: 1) the natural resources will be preserved to the maximum feasible extent; (2) the open space meets the requirements of Ordinance § 8.3.5(5), § 8.3.4(4) and § 8.3.6; and (3) the proposed SUP/PUD meets the objectives set forth in Ordinance § 8.3.2. Further, the Court finds that Byron's recusal was proper pursuant to the Peninsula Township Board Rules of Procedure. The issues delegated to the Peninsula Township Fire Department and the Township Engineer for review and approval, including the location and functionality of the emergency access road, and whether the standards for soil erosion, grading and storm water have been met, are remanded to the Board for further proceedings consistent with this decision and order.

27.     Komendera and POMP then filed an application for leave to appeal Judge Rodgers' decision to the Michigan Court of Appeals, which was denied on June 20, 2016 for lack of merit in the grounds presented. **Exhibit 8**. Judge Rodgers' decision is law of the case and binding on all future rulings of the Township and, because of the Court of Appeals' ruling, also binding on future court rulings. *People v Perez-Garcia*, dkt no 305086, 2012 WL 5856909, at *3 (Mich. App. October 30, 2012).

28.     Komendera and POMP subsequently sought leave to appeal to the Michigan Supreme Court, which was denied April 4, 2017. **Exhibit 9**.

29.     While the appeals to the Michigan Court of Appeals and Michigan Supreme Court were pending, and in accordance with Judge Rodgers' Opinion remanding the application to the Township Board, the Township Board commenced a review of the matters which continued until January 23, 2018.  Although the first approval of the SUP, regarding all issues under the PTZO, took only 7 months, the Peninsula Township review of matters on remand was not concluded until more than two years after Judge Rodgers' opinion.

30.     On March 15, 2016, Township Engineer Brian Boals of Gourdie Fraser, sent a letter to Peninsula Township Director of Planning & Zoning, Michelle Reardon, stating "At this time we find the revised grading plan and additional information for the cul-de-sacs to be acceptable, with the intended site grading and drainage patterns for the roadways and building sites communicated sufficiently on the plan set.  By way of this letter we recommend engineering approval for the plans as reviewed." **Exhibit 10**.

31.     Shortly thereafter, and on or about April 18, 2016, another developer presented a SUP/PUD application for a residential development in Peninsula Township called Vineyard Ridge. **Exhibit 11**.  This development (1) proposed less open space and more density than The 81; and (2) requires a larger area of site grading than The 81, and also grading that is in closer proximity to homes on neighboring and adjacent properties than the site grading on The 81.

32.     Additionally, Vineyard Ridge, like The 81 (and a substantial percentage of all of the land in Peninsula Township) was the site of fruit farming which, in the past, utilized chemicals which left small amounts of residue on the ground.  In connection with the Vineyard Ridge application, its developer submitted, on September 6, 2016, a report of Otwell Mawby (**Exhibit 12**) summarizing environmental inspections of the Vineyard Ridge Property from 2009 and 2010.

33. The Otwell Mawby report, **Exhibit 12**, explained that Vineyard Ridge had been the site of both cherry and apple orchards, resulting in agrochemicals remaining in surface soils; and that the soil sampling had detected low levels of arsenic.

34. The Otwell Mawby report (**Exhibit 12**) also stated, however, that

For the MDEQ generic criteria to be applicable the exposure to the soil must be repetitive and occur over a long period of time. . . .  It would take repeated dermal and ingestion exposures over an extended period of time in order for the generic criteria to be applicable.  The generic direct contact criteria was developed based upon very conservative exposure assumptions over a 30 year period.  The ingestion exposure frequency is 350 days per year . . . .  The dermal exposure frequency utilized by MDEQ is 245 days per year. . . .  It requires direct soil to skin contact. The MDEQ analysis does not assume that there is any cover over the soils, [but instead] that the soil is exposed for direct dermal contact or potential tracking into the home.  A yard with vegetative covering, a house that covers a portion of the property, driveways and parking areas all would successfully mitigate any potential direct contact exposure . . . .  grading, construction of roadways, parking and drive areas, homes and landscape vegetation . . . would provide substantial mitigation for potential direct contact exposure to the impacted soil.  Additional measures . . . include additional sampling and testing . . . additional soil covering in areas of high use, or mixing of the soil with un-impacted soil to reduce the Arsenic levels.

35. At the same time that the Vineyard Ridge application was pending in Peninsula Township, opposition to The 81 development continued.  On May 10, 2016, Komendera Attorney Scott Howard was quoted in the Traverse Ticker as saying "[T]here are substantial issues with site grading.  I mean, the amount of earth that they're moving is pretty astounding," Howard says. "There are also concerns about what's in the soil from historical orchard and farm use.  That's information that's not been provided by the developer."  **Exhibit 13**.

36. Then, on June 20, 2016, the same day that the Michigan Court of Appeals denied the Komedera appeal for lack of merit, the Peninsula Township Planning Commission held a special meeting at 5:30 p.m. to consider amendments to the Zoning Ordinance.  At the beginning of this

11

meeting, floor time was granted to citizens "for items not on the agenda."  The minutes (**Exhibit 14**) reflect comments by Mr. Komendera and numerous other citizens, objecting to The 81 development uniformly on environmental grounds, citing lead, arsenic, farming chemicals, and demanding that Peninsula Township require soil testing and an environmental assessment of the property.  The meeting was attended by Attorney Peter Wendling, of Defendant YGW.

37.     Also on June 20, 2016, the regular meeting of the Peninsula Township Planning Commission was held at 7:00 p.m.  On the agenda were both the Vineyard Ridge project and an alternate plat request as of right (not the PUD application) for The 81.

38.     The agenda and minutes of this June 20, 2016 meeting, also attended by YGW's Wendling, are attached as **Exhibit 15**.

39.     On or about July, 2016, Komendera began running ads in local papers (see **Exhibit 16**) with an aerial view of The 81 property.  In a caption, the ads stated:   "POP QUIZ:  how much Lead, Arsenic and Mercury are in this field?  ANSWER:  We don't know!  Because the developer fails to get a soil test before disrupting this East Bay shoreline."

40.     On July 18, 2016, the Peninsula Township Planning Commission held its regular meeting (minutes, **Exhibit 17**).  Immediately following the announcement at the beginning of the meeting (Commissioner "**Coture** informs audience that 'the 81' is not on the agenda tonight"), David Taft stated he was "concerned about contamination on this property," and "urges the Planning Commission to ask the developer why he has not initiated an Environmental Assessment, asks the Town Board to ask the same question and asks for a status update at the Public Hearing on this matter."  Peninsula Township attorney, YGW's Peter Wendling, was in attendance at the meeting.

12

41.    Then, as scheduled, the PC moved to the Vineyard Ridge application.  After public comment, the PC discussed various  "environmental assessment to look at Lead and Arsenic." Then, a motion passed including investigation of "Property History and Environmental Assessment." **Exhibit 17**, minutes, p. 3.

42.    Between July 28, 2016 and August 2, 2016, Attorney James Young, a partner with Attorney Wendling at Defendant YGW, exchanged emails with Peninsula Township Director of Planning & Zoning Michelle Reardon and Peninsula Township Engineer Brian Boals regarding The 81 (**Exhibit 18**), including on August 1, when Boals stated "Jim, I went over our last report from March 15, 2016 and assuming no changes to the plans (I have not seen anything new come in), then we stand by our approval with regards to the project site engineering (i.e. stormwater, drainage, private roads, and site grading). . . .  still hanging out there was the status of the fire access road." Young replied on 8-2, "Great!  Thanks for the prompt reply regarding the engineering issues."

43.    On August 2, 2016, the primary election was held in Peninsula Township.  All seven members of the Peninsula Township Board were replaced, with Rob Manigold elected as the new Township supervisor.  Prior to the election, and on July 11, 2016, an interview with Manigold was published in the Old Mission Gazette, and shortly after the election, and on September 12, 2016, another interview with Manigold appeared in the Northern Express.  These articles are attached as **Exhibit 19**.

44.    In the July 11, 2016 article (**Exhibit 19**, part 1), Manigold is quoted as saying "'The 81 project' was handled poorly by the Town Board.  When our own residents sue us for not following our Master Plan and zoning ordinances, we have real problems.  It is not fair to our taxpayers paying the legal bills, nor to the developer.  I would not have passed "The 81" with

multiple contingencies.  I would have opened up a dialogue between the developer and the community to try and find the common ground, worked with the <u>Grand Traverse Regional Land Conservancy</u> to place a conservation easement on the agricultural component, and developed a funding source to help the developer work to meet his business plan while reducing the number of houses."  In answering the question "what qualifications will you bring to the role" of Township Supervisor, Manigold included "[v]olunteer at Grand Traverse Regional Land Conservancy."

45.   The September 12, 2016 Northern Express article (**Exhibit 19**, part 2) stated, in regard to The 81 and his election, that "[u]proar over the development – and a perceived lack of transparency in the approval process – led a slate of seven challengers to run for each elected township seat in August.  Each one of the challengers won . . . .  Rob Manigold, the former township supervisor, was one. . . .  Manigold said the seven challengers were bolstered by concern over the way the township government had been run for the past two years.  'I think the 81 development was probably the catalyst for people to start wondering why they weren't being heard or didn't feel like they were being heard in meetings,' Manigold said."

46.   On August 15, 2016, Township Engineer Brian Boals followed up on his March 15, 2016 correspondence with another letter to Planning Director Michelle Reardon.  Therein, Engineer Boals approved fire lane design plans, subject to Township Fire Department approval, and stated "our recommendation for engineering plan approval remains in place in accordance with our March 15, 2016 review letter."  **Exhibit 20**.

47.   Then, on August 23, 2016, the Peninsula Township Township Board held a hearing on The 81 project.  At the hearing Komendera Attorney Howard presented a letter (**Exhibit 21**) with comments substantially identical to those contained in his July 14, 2015 letter.

14

48.    The minutes of the meeting (**Exhibit 22**), p. 3 reflect the following exchange regarding the issues remanded for consideration by Judge Rodgers:

> **Reardon** read the judge's final statement from the decision. "The issues delegated to the Peninsula Township Fire Department and the Township Engineer for review and approval, including the location and functionality of the emergency access road, and whether the standards for soil erosion, grading and storm water have been met, are remanded to the Board for further proceedings consistent with this decision and order." [Township Attorney] **Young** said by order of the court these are the only issues that the Township Board can lawfully consider. Any other issues or standards that the court did not specifically remand have been decided. **Rosi** asked does that mean the Board should be looking at grading and erosion and whether or not the proposal is satisfactory or appropriate for this location. **Young** said yes.

49.    A motion to adjourn was then made and passed, followed by numerous comments of what had become the *raison d'etre* of the opponents of The 81 – contrived environmental issues, used as a pretext to defeat a project that had already survived, except for minor issues of fire lanes and a grading plan, attempts to appeal its approval all the way to the Michigan Supreme Court. **Exhibit 22**, pp. 4-7.

50.    On September 4, 2016, Peninsula Township Supervisor Pete Correia passed away, and at a special meeting on September 7, 2016, Supervisor-Elect Rob Manigold was sworn into office early. His appointment was effective as of September 12, 2016. **Exhibit 23**.

51.    On September 12, 2016, the Northern Express article (**Exhibit 19**) was published. In addition to his frank admission that The 81 was "the catalyst" for his and the other successful challengers' campaigns to take over the Peninsula Township Board, Peninsula Township Supervisor Rob Manigold stated that "the experience with the 81 showed him that environmental studies should be required for large developments, and although there might be nothing that can be done about the 81 development at this point, he hopes the township amends its ordinance so that studies are required

for future proposals.  It could help ease concerns that historical contamination from farming operations could be unleashed through earth moving and migrate to neighboring properties or the bay."

52.    In the September 12, 2016 article (**Exhibit 19**), Manigold also offered comments regarding the Vineyard Ridge development – all of which were uniformly positive, and none of which remotely mentioned the documented environmental matters from the Otwell Mawby report (**Exhibit 12**).  "Controversy over the 81 development has turned up the ears of residents to new development proposals in general.  Residents also have questioned the next development proposed after the 81, a condominium neighborhood – 47 homes on 28 acres – proposed for the other end of the township, near the Pellizari Natural Area.  Manigold said his impression of Vineyard Ridge is that the proposal looks to be in line with what would be allowed.  'It looks like a good development, actually,' Manigold said. . . .  It's been proposed as a neighborhood to be marketed to people over 55.  It's bound to be priced well out of reach for working families.  Manigold said there isn't much the township can do about that."

53.    At its next meeting, and on September 19, 2016, the Peninsula Township Planning Commission took up the Vineyard Ridge application again (minutes, **Exhibit 24**).  The developer's representative, Mr. Christensen, explained that the developer had complied with a request for more information on various topics including "environmental study," having supplied the Otwell Mawby report (**Exhibit 12**) on September 6, 2016.  Various comments of the Planning Commissioners were made but did not include environmental issues.  "Discussion to continue at the next meeting." Peninsula Township attorney, YGW's Peter Wendling, was in attendance at the meeting.

54.     Among the citizen comments at the September 19, 2016 meeting of the Peninsula Township Planning Commission were those of Laura Serocki.  The minutes (p. 3) reflect that she "was reading about disturbing soil with arsenic.  What about dust during construction and the health of workers and neighbors?"  In response, Peninsula Township Attorney Wendling of YGW (law partner to Attorney Young from the August 23, 2016 meeting regarding The 81) explained simply that "[t]here would be dust control regulations as part of the construction code."

55.     Then, on September 22, 2016, the improprieties that give rise to many of Plaintiff's claims in this case began, when Supervisor Manigold and YGW began a dialog about environmental issues as a pretext to defeat development by The 81, all in stark contrast to the fast track upon which YGW and Peninsula Township had placed the Vineyard Ridge devlopment.  YGW's billing statement from that date (**Exhibit 25**) reflects billings for both The 81 and the Vineyard Ridge project, and in regard to The 81 states "telephone call to supervisor regarding status and also whether environmental study has been done or can be required."  Later, and at a November 17, 2016 meeting of the Peninsula Township Board, Supervisor Manigold would frankly admit that the "[f]irst thing he did when he took office was to ask for an environmental study, but because of it already passing, there was nowhere to put it."  **Exhibit 26**, p. 6.  With clever lawyers, though, Manigold and his new co-members on the Board, undaunted, pressed forward with their new plan – to find a place "to put it."  On September 28, 2016, the YGW billing statement (**Exhibit 25**) charges for an "interoffice conference regarding the inquiry about environmental studies."  The YGW billing statement is truly a statement of YGW as opposed to individual attorneys, as it does not specify which attorney performed which services on which file.

56.    On October 18, 2016, Peninsula Township Engineer Brian Boals wrote to Peninsula Township's new Director of Planning & Zoning, Gordon Hayward (**Exhibit 27**).  In this letter, Boals describes reviewing revised plans increasing road width from 20' to 26' for fire protection access purposes, stating the plans are consistent with road design and storm water control requirements of the Zoning Ordinance, and confirming minimum 65% open space requirements continue to be met. "[O]ur recommendation for engineering plan approval remains in place in accordance with our March 15, 2016 review letter."

57.    On October 20, 2016, while the Komendera appeal to the Michigan Supreme Court was still pending, Komerdera Attorney Howard emailed Peninsula Township Attorney, YGW's Young, sending him proposed findings of fact as Young had previously (on September 26, 2016) requested, stating "[w]e may want to revised [sic] based on review of the most recent documents submitted by the developer and/or the Township Engineer."  **Exhibit 28**.

57.1.    Behind the scenes, the conspiracy to violate Plaintiff's equal protection rights was beginning to develop.  **Exhibit 106** is a set of October 21, 2016 emails between the Grand Traverse Regional Land Conservancy's Executive Director, Glen Chown and Doug Mansfield, Plaintiff's chief planner and engineer, in which Chown told Mansfield that "the Conservancy is very mich interested in exploring options for protecting the significant natural features of the property and I want to share some new information about a public funding source for land acquisition that was not previously available if in fact Kevin [O'Grady, Plaintiff's owner] would be interested in exploring possibilities."  This exhibit also contains Chown's subsequent email to his management team, confirming that (1) Peninsula Township Supervisor Manigold "would be very much interested in having the township own the shoreline and wooded slope area as a natural area and possible non-

motorized Kayak/canoe refuge site tied to the Lake Michigan water trail" and (2) that Manigold "thinks the former farmland area would be very attractive to potential 'conservation buyers' who might be interested in hops or whatever."

58.     On October 25, 2016, YGW's Young emailed Plaintiff's attorney Philip Settles, stating "[a]s far as the issue of whether the Township can require Environmental Assessment reports, I will be researching this issue.  I want to be prepared in case a Township Board member makes this inquiry at the next hearing."  **Exhibit 29**.  Obviously, this issue was already extant, not as a hypothetical and potential need, but rather, as an active issue being discussed by YGW's Young with Manigold and the subject of at least one "interoffice conference" at YGW.

59.     In stark contrast to his prior statements and advice affirming the narrow and limited scope of Judge Rodgers' remand, and on November 7, 2016, YGW's Young emailed Attorney Settles, and also, Attorney Howard, copying Manigold and Hayward, stating "[P]lease note that this email does not alter the types of conditions recommended by the previous planner in her draft Findings and certainly do not preclude the planner from recommending other conditions or the Township Board considering other conditions even if the conditions are totally new… that is one of the purposes of a public hearing to get new perspectives that may not have been discussed or considered previously."  **Exhibit 30**.

60.     Then, on November 16 and 17, 2016, YGW's Young exchanged additional emails with objecting appellant Komendera's counsel, Scott Howard, regarding Young's possible use of some of Howard's proposed findings of fact – which, of course, were drafted from the perspective of simply denying The 81's application.

19

61.    The meeting of the Peninsula Township Board was held on November 17, 2016 (minutes, **Exhibit 26**).  At the meeting, Attorney Howard presented a letter (**Exhibit 31**) which was similar to his objecting letters of July, 2015 and August, 2016, but also joining the chorus – on page 2, specifically mentioning the "possibility of soil contamination on the property from historic pesticide application" and "use of pesticides that contain things like lead and arsenic. The Developer has not presented the Township with any information or studies related to the condition of the soil on the property."

62.    The November 17, 2016 meeting was held ten months after Judge Rodgers' remand order and five months after the Court of Appeals' essential affirmance of that remand order.  Despite the complete satisfaction of all of Judge Rodgers' remand concerns (and a legitimate expectation of approval by The 81), YGW and Peninsula Township had other plans.

63.    At the beginning of the meeting, and now on the record, YGW moved away, at least ostensibly, from its November 7, 2016 (**Exhibit 30**) position that the "Township Board [may] consider[ ] other conditions even if the conditions are totally new," with YGW's Young stating, prior to the opening of the public hearing (minutes, pp. 1-2), that there were four remand issues – (1) adequate safety standards for fire protection (including emergency access road); (2) soil erosion; (3) grading; (4) storm water.  Young then stated that the "board's decision is limited only to the issues that were remanded.  The board cannot redo any prior decisions."

64.    Then, after the meeting was opened to the public, several citizens presented objections and demanded soil testing and environmental analyses.  **Exhibit 26**, pp. 2-5.

65.    After the close of public comment, the Board picked up the ball.  First, Trustee Westphal commented that "soil, slopes and grading . . . have the capacity to create a perfect storm

20

on that site.  They have the potential to directly affect human health.  They have the capacity to

degrade a natural and cultural ecosystem," and asking The 81's attorney Philip Settles about getting

environmental assessments, and warning about issues related to contaminated land creating problems

for buyers in getting a mortgage when buying a house (**Exhibit 26**, p. 5).

66.      Confirming his position that approval was not remotely on the horizon, the minutes

reflect Supervisor Manigold's comments (**Exhibit 26**, p. 6) as "there are too many contingencies

from the beginning.  First thing he did when he took office was to ask for an environmental study,

but because of it already passing, there was nowhere to put it.  He thinks the developer should take

it back to the PC and come up with a clear project proposal (including an environmental assessment).

He's heard the stories of the other communities – he grew up on a farm.  Sometimes nothing shows

up in the assessment.  What he's hearing is that we table it until we get an answer . . . including what

findings of fact we use.  He wants to make sure they do the right thing.  He doesn't think they can

make a good decision tonight."

67.      The uncertainty of the other Board members on this issue (which was not surprising

given the utter absence of the issue from other developments, like the environmentally identical

Vineyard Ridge), was evident from their comments (see **Exhibit 26**, pp, 6-7):

> **Witkop** – she'd like to hear from Gordon and Jim . . . does an environmental study
> fall under what's remanded by the Judge?  **Young** – it goes back to the findings that
> the board did in 8/15 and the judge's remanding.  8.1.3k – 'the grading or filling will
> not . . . . adversely affect the adjacent or neighboring properties.' – adding a road and
> the grading that would come from that . . but that's not the whole property, imposing
> a condition with the secondary road – because that requires grading, an
> environmental study is necessary.  There is nothing that stops the developer from
> voluntarily undertaking that assessment on their own.  The bigger project needs
> serious research and something in writing. . . ."

**Witkop** – Do you have an opinion if the environmental study falls into what the judge remanded?  **Hayward** thinks it does for additional access road only.  They can't have an environmental assessment on the entire project – only what's been remanded back.

**Witkop** – if the board votes on what the developer has proposed, the environmental study can only be pertaining to the additional road.  Will you (Jim) enter an opinion if the fire code applies?  **Young** – he has no problem interpreting our ordinance as drafted.  He needs historical application of ordinance from Gordon.  That's what's important to the court.  He needs background facts before he can provide an opinion.

**Witkop** – to just walk away is unfair to all involved.  She doesn't think that the environmental study applies.  **Rosi** – she thinks it will apply.  She wants the attorney to look into it.

68.    After passing a motion to adjourn for future deliberation, Trustee Avery (who had voluntarily recused himself from the prior deliberations because "[o]ne report attacks a client of his," **Exhibit 26**, p. 1) commented, "he's been involved in environment for 37 years.  We've asked this developer to jump through hoop after hoop after hoop.  Now we're going to create a new set of hoops.  Dr. Komendera brought a lawsuit that was thrown out.  Judge determined all but 4 things. The developer will bring another lawsuit and we'll lose.  Thousands of dollars will go towards legal fees." **Exhibit 26**, p. 7.

69.    On November 28, 2016, Attorney Settles followed up by email with YGW (**Exhibit 32**).  Therein, Attorney Settles stated "When we adjourned on the 17th I understood that the Township was awaiting your legal opinion before scheduling a meeting.  I understand the Board is looking to you for your opinion on the following two issues: 1) whether an environmental assessment is legally required . . . ."

70.    Later the same day, YGW's Young responded, stating "I must evaluate about 5 legal issues in this matter.  The truly MAJOR one relates to the impact of the Judge's decision voiding the

22

Board's decision regarding the grading standard which it had delegated to the Twp. Engineer. This standard includes the concept of "adverse impact" related to any grading. Whether that standard has been met must now be decided by the Township Board." **Exhibit 33**. The email is copied directly to Kevin O'Grady, Plaintiff's owner.

71. Two days later, the Peninsula Township PC met on November 30, 2016 (minutes, **Exhibit 34**), to consider whether Peninsula Township should amend its ordinance "making a BEA [Baseline Environmental Assessment] an application requirement for all PUDs, Subdivisions, and Site Condominiums." **Exhibit 34**, p. 2.

72. The minutes, **Exhibit 34**, p. 2, reflect YGW's Peter Wendling, stating "chemicals were often used in the orchards (arsenic), so there is a history of potential contamination on these sites from ag chemicals. He doesn't see a problem to have a baseline as part of the requirement for the app in order to protect health and wellness. It can definitely be justified. Other townships have that provision in their ordinance."

73. Also considered was the question "can we simply add BEA in the application check list by asking for a copy of a BEA if one exists," and YGW's Wendling responded "It can be done either way - the check list can be incorporated as part of the ordinance. It can be a required item you need to submit for a PUD / SUP." **Exhibit 34**, p. 2.

74. The clear import of these discussions was that in Peninsula Township, no BEA or environmental review was, as of November 16, 2016, required of any SUP, PUD, or development, either by ordinance requirement or any "application check list."

75. Page 5 of the November 30, 2016 minutes (**Exhibit 34**), reflect another discussion point – "[c]onsider scheduling a December or January public hearing for SUP #127 [Vineyard

Ridge].  Mark Nadolski, President of Protect the Peninsula, as he had done in the past, asked the Township Planning Commission "[i]s the PC requiring environmental studies on this project," and was assured by YGW's Wendling, that "yes, they did a complete one."  The minutes also reflect that a "study performed was related to soil contaminants study from previous ag on this site . . . they fully intend to comply with all recommendations from that study."

76.    Five days after YGW's Wendling had discussed with the Peninsula Township PC the subject of adding, for the first time in Peninsula Township history, environmental analysis requirements to zoning requirements for PUDs and SUPs through amendment of the ordinance or the application check list, and on December 5, 2016, YGW's Young emailed The 81's Attorney Philip Settles, stating "[regarding] Section 8.1.3(k) . . . my PRELIMINARY analysis is that in order to determine whether grading will cause an adverse impact, the Board has the legal authority to request the applicant to undertaken [sic] environmental testing in any area where there will be grading.  If the applicant does not do this, then the Board may find that the standard is NOT met due to a lack of information.  Since this relates to public safety and given the history of this site and the use of pesticides, I believe that a Court will firmly support such a position.  I have been trying to come up with opposing arguments . . . but no luck.  Your client won't like this . . . . but, I am very close to putting this opinion in writing and sending it to the Township Board."  **Exhibit 35**.

77.    Thereafter, the following emails were exchanged between Attorney Settles and YGW's Young (see **Exhibit 36**)[1]:

_____

[1]The emails in **Exhibit 36** are, upon information and belief, shown in exact reverse chronological order; however, the time stamps appear to be off.  A reading of the emails in the reverse order they appear makes it evident that the exchange occurred in that way.

24

a.   December 6, 2016 – Young states, regarding "the grading issue and potential for environmental assessment," "this issue involves getting 'accurate information' from the Township regarding past practices . . . my sources will be the planner and acting fire chief."

b.   In the same email, Young comments, "have you and your client discussed the liability potential IF (heaven forbid) grading or excavation was done which "stirred up" pesticide residue in the ground?  If I bought a site condo and then later discovered that pesticide residue had been or would be a potential health problem (especially, to an infant or toddler), I would not hesitate to start a class action lawsuit on behalf of every unit owner . . . especially, if I found out that the developer KNEW of the prior use of pesticides on-site. . . ."

c.   Having raised the spectre of an environmentally based catastrophe, Young closes his December 6 email with the suggestion, "[f]orward this email to your client as you see fit.  I know that you copied him on this email . . . however, ethically and out of respect to you, I felt uncomfortable in sending him a copy of this email unilaterally." No explanation is offered as to why YGW's Young might have believed that "sending him a copy of this email unilaterally" could possibly have not been in direct violation of Michigan Rules of Professional Conduct 4.2(a), which provides "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

d.    Attorney Settles then responded, "I gotta buy you a drink next week," to which YGW's Young replied, "[a] good Scotch at Cambria Suites . . . you gotta "date". . . . well, only kinda."

e.    Then, YGW's Young sent Attorney Settles the following email (capital letters in original):

GREAT MINDS THINK ALIKE.

I AM DRAFTING MY OPINION NOW.  THEN, I WILL SENT IT TO [YGW ATTORNEYS] BRYAN [GRAHAM] AND PETER [WENDLING] FOR A VIGOROUS CRITIQUE.

I JUST FINISHED THE GRADING AN ADVERSE IMPACT STANDARD ANALYSIS AND AM JUST STARTING WORK ON THE FIRE ACCESS/INTERNATIONAL FIRE CODE ISSUE.

AND . . . I AM DRINKING A VERY GOOD SCOTCH WHILE I WORK . . . IDEALLY IT WON'T ADVERSELY IMPACT MY TYPING.

f.    Later the same night, YGW's Young emailed Attorney Settles again, stating "We may truly need to talk soon.  I am beginning to believe that my opinion could result in a "win-win" situation . . . at least to the extent that all parties may be getting "part" of what they want . . . or want to avoid.  FYI – the Supervisor has agreed to hold a special meeting **in closed session** NEXT WEDNESDAY . . . while I am in town . . . so that I can explain (& be a[n] advocate for and answer questions about) my legal opinion."  Attorney Settles then replied, "[i]t would be great to get a closed session next as soon as next Wednesday, plus, the "win-win" sounds promising, after all, we 'great legal minds' are not strangers to compromise in getting things accomplished."

26

g.      Young then responded "[l]iterally, just finished and sending it to [YGW's] Bryan [Graham] and [YGW's] Peter [Wendling] now.  Let's talk on Monday."  Later, and on December 9, 2016, Attorney Settles replied, "I will talk to Kevin [O'Grady, The 81's principal] and ready him to compromise on, something anyway."

h.      On December 10, 2016, Young emailed Attorney Settles again, stating "Opinion reviewed by  [YGW's] Bryan [Graham] and YGW's Peter [Wendling] and sent to Township.   Special meeting with closed session to meet with me is set for Wednesday at 9 am.  The opinion will not be given to members until the meeting. We need to talk Monday to see if my 'win-win' is feasible.  My opinion to a major extent helps your client and to a lesser extent will require him to do something that he so far has not wanted to do. . . .  To reach a result that treats your client fairly AND is consistent with the law (including Township ordinances), we need to talk BEFORE my Wednesday meeting."

78.     YGW having collectively amongst its attorneys having discussed and approved the "win-win" plan, and then having gotten approval for this "win-win" plan at the Wednesday, December 14, 2016 closed session, YGW began its quest to create factual support for its "opinion." On December 20, 2016, YGW's Young emailed Township Engineer Brian Boals (**Exhibit 37**). Among other directives,  YGW's Young told Boals:

"I know that Gordon will be communicating with you regarding the type of testing to be done at the 81 site.  However, I just received this email from Attorney Howard, who represents the citizen's group. . . .  I thought it would be wise for Howard to get Grobbel's input regarding testing, so you could see it.  I want you to recommend testing that is professionally justifiable given the historical use of this property.  If you agree with Grobbel, then fine.  If you believe that different testing is appropriate, then feel free to disagree with the email shown below and provide me with your reasoning.

27

If the developer elects to fight us, then I want testing that can be supported by expert testimony. Hopefully, the developer will simply agree to the testing that you recommend. My 'game plan' is: 1.  get your recommendation regarding the type of testing to be done at the site.  2.  send your email to the developer's attorney to see if the developer will voluntarily do the testing.  As you know, they will probably consult with Mawby before they make a decision.  3.  If the developer disagrees with the type of testing that you recommend, then you, Gordon and I will confer to discuss the type of testing that the developer wants to do and whether their position is reasonable.  It would not be fair to the Township, the public or future users of the site, to accept "watered-down" testing.  This is why we need your professional recommendation.  If the developer will not comply with your recommendation, then I will want the justified for our position [sic] put 'on the record at a public hearing," so it can be read by the Judge if litigation becomes necessary."

79.     Notably, at the time of this email, both the Township and The 81 were still litigating the pending appeal against Attorney Howard.  As noted in **Exhibit 37**, Attorney Howard's expert, Grobbels, had provided the following advice to Attorney Howard, which was passed on to Peninsula Township Engineer Boals in the December 20, 2016 email:

"Jim, Chris Grobbel suggested the following for testing of soils:  'Yes, they should do a statistically significant soils assessment for lead and arsenic in accordance with MDEQ Part 201's Verification of Soil Remediation guidance document . . . that procedure requires setting up a grid and sampling/assessment on randomly chosen nodes for statistically significant soils assessment from past ag practices.'"

80.     On the same day, Attorney Settles received an email from his assistant (**Exhibit 38**) stating "Just talked to Jim Young.  He will be receiving an email from the Township Engineer's recommendation about what kind of tests should be done on 81 **in the next couple of days**.  He suggested you do nothing at this point until you receive a copy of that email, which he will forward to you as a courtesy . . ."  Emphasis added.

81.     The next day, December 21, 2016, YGW's Young and Boals again exchanged emails. **Exhibit 39**.  First, Boals reported that "I need to do some research into this how this project and the contaminants/sources involved apply to MDEQ Part 201.  To be honest I have not been involved

with preparation of due care plans for past agricultural uses to residential, and I understand there may be some agricultural exemptions applicable under Part 201, but I need to spend some time looking into it. . . . it is safe to assume the contamination will be found. . . ."

82.     YGW's Young replied (**Exhibit 39**), that "I absolutely agree with your thoughts. . . . I would rather go in a deliberate fashion and be absolutely satisfied that our decisions are fully justifiable.  This matter will result in litigation eventually.  I am sure that [Peninsula Township Supervisor] Rob [Manigold] understands and agrees.  Even if the developer switches from a Special Land Use to a Use by Right, the environmental issues will remain.  It is a pleasure to work with you."

83.     Having begun the process of singling out The 81 as *the only Peninsula Township development for intense scrutiny of the nature and extent of residual agricultural chemicals*, YGW then began work on the next part of the "win-win" strategy – pressuring the owners of The 81 to not develop their property, but instead, to sell their property to their client Peninsula Township, to avoid their threat of environmental devaluation of the property, backed up with expert opinions prepared with the intent of using them "if litigation becomes necessary."

83.1     In this regard, on January 10, 2017, YGW's Young sent Peninsula Township Supervisor Rob Manigold an email, with the subject line "GT Regional Land Conservancy – authority to interact." **Exhibit 107**.  Therein, Young, in what he stated was "a follow up to my voice mail," told Manigold that he had spoken "last Friday" [January 6] with GTRLC's Chown, regarding Chown's "renewed interest in the Conservancy purchasing the property currently owned by O'Grady."

83.2.   In this January 10 email, YGW's Young told Manigold that he "was the Conservancy's original attorney and was on the Board of Directors when Glen [Chown] was hired. Thus, we have  worked together for a very long time."  He also told Manigold that "Glen believes that the O'Grady property would be a prime candidate for at Trust Fund grant."  **Exhibit 107**.

83.3.   Young's email, **Exhibit 107**, continues stating "Glen will be approaching O'Grady directly.  In addition, Glen would like to be able to communicate with me as needed on various issues, **including zoning questions that could impact a potential purchase** and other issues." Emphasis added.

83.4.   Then, Young states (**Exhibit 107**):

I am the logical point of contact for a number of reasons.  First, it would not be appropriate for him to work directly with you or the Township Board since all of you are operating in a "quasi-judicial" capacity in deciding the special land use application.  I do not want O'Grady to claim that you or the Township Board are manipulating the zoning decision to force him to sell or impact a sale price.

83.5.   Of course, it was clearly the case that YGW, Chown, and the Township were "manipulating the zoning decision to force [Mr. O'Grady] to sell [and] impact a sale price – such was exactly YGW's and Young's "win-win" strategy.  The Young email (**Exhibit 107**) then continues:

However, a potential purchase by the Conservancy and the value of the property would be impacted by the land zoning status and the presence or absence of toxins on the property.

In other words, even though YGW's Young had explained that he did "not want O'Grady *to claim*" that the Township was "manipulating the zoning decision to force him to sell or impact a sale price," he was reciting those very motives and potentials to Manigold.  While ostensibly keeping Manigold and the environmental testing decisionmakers on the other side of a "Chinese wall," YGW

30

masterminded the plan of using the Township's zoning power to indeed "manipulat[e] the zoning decision to force  [Mr. O'Grady] to sell [and] impact a sale price."

83.6.    Then, YGW's Young stated (**Exhibit 107**):

Thus, I need your permission to communicate with Glen and answer his questions as needed.  This could include sharing with him information about the zoning ordinance, the status of the zoning decision related to The 81, the types of environmental tests that are be [sic] recommended by the Township Engineer and the results of any such testing.  In essence, I want permission to communicate with Glen on any issue or question that he raises.  However, I will not tell him of any legal opinions or legal advice that I have given to the Township without your prior specific authorization.  Consistent with this limitation, **I would request you authorize me to share with Glen my past opinion regarding the Township's ability to require environmental testing on the O'Grady property.**  This does not harm the township since O'Grady's attorney already knows my position and the advice that I have given you regarding the environmental testing and my firm believe that the township can require such testing or [sic] O'Grady refuses, then find that the "grading" standard has not been met.

Plainly, this email summarizes the intent of Defendant and the conspiracy that is at the core of this case – to threaten Plaintiff with environmental testing to reduce, threaten to further reduce, and if need be, destroy the value of Plaintiff's property, while at the same time working with the Grand Traverse Regional Land Conservancy to, as YGW's Young put it, "force [Mr. O'Grady] to sell [and] impact a sale price."

83.7.    The January 10, 2017 email (**Exhibit 107**) concludes:

A short email authorizing me to proceed as outlined in this email is sufficient.  Call me as needed.  In terms of briefing the township board, I suggest that any such discussions do not occur at a public meeting.  Eventually, Glen and the Conservancy may send you a public communication.  However, until that time, it would not be wise for the Township to take any action that could adversely impact Glen's efforts.

84.    Manigold responded, "Jim please proceed with working with GTRLC, as per your Email. . . Rob."  **Exhibit 40**, **Exhibit 107**.

84.1.    Immediately thereafter and at 6:03 p.m. on January 10, 2017, Young emailed Chown (**Exhibit 108**), stating:

31

This will confirm that Rob has authorized me to communicate with you and answer any questions that you may have regarding the Conservancy's interest in the O'Grady property.  I am sending Rob a copy of this email so he knows that I have communicated with you.  However, in the future, emails and other communications should be addressed strictly to me.  Since the Township Board members, including Rob, are acting in a "quasi-judicial" capacity in deciding the special land use application for The 81, I do NOT want to "contaminate" their decision-making process and raise potential liability or conflict of interest problems.  I am making this a top priority.  Accordingly, you may contact me at ANY time.  Although Portland is 3 hours behind TC, may wife and I tend to get up very early from Monday – Thursday.  Thus, if you need to talk with me at the beginning of your workday, that is no problem.  It will be great to communicate and work with you again!!!

85.     The next day, January 11, 2017, Glen Chown of the GTRLC emailed YGW's Young

in response to Young's prior communication (**Exhibit 41, 41a**), discussing a proposed email to The

81's chief planner and engineer Doug Mansfield and stating:

"Jim, thanks for confirming your conversation with Rob and for giving me the green light to take the next step here.  Along these lines, I have composed a draft email for Doug Mansfield with attachments and links.  Please review and let me know if you think this hits the mark and, if not, what changes make sense.  Also, are you confident that Doug will forward it to O'Grady or should I email it to both of them?  If I were Kevin I would want to fully vet the outright sale option for conservation sooner, rather than later given the risks and the growing costs are pursuing the development option.  Looking forward to getting your feedback.  What is not in here is things like:  we can discuss how to pay for the appraisal (Conservancy could do that but we should agree on the appraiser so it is someone they have confidence in); confidentiality (we could pursue this exploratory phase for the next 45 days on a confidential basis); timing of the deal (assuming we agree to a price for an out right sale, we would need to have an agreement by say March 1, to give the township time do you have a public hearing prior to an April one grant application deadline; however, the Conservancy could put down a sizable option payment in March so that we start to shoulder the risk; ideally, closing would not occur to after [sic] the trust fund meeting in Dec.  Perhaps the end of this email should be "would like to sit down to discuss timing and logistics."  We really do need to have this meeting in the next few days or the hourglass is going to run out UNLESS we get an interim buyer to just take him out and that actually is a possibility as well if Kevin just wanted to walk away and not go through the Trust Fund process with us and the township . . . ."

86.     Following Chown's email as quoted above, is a proposed email from Chown to Doug

Mansfield, for review and revision by YGW's Young.  **Exhibit 41, 41a**.

32

86.1.    Then, and also on January 11, 2017, Chown sent his management team an email (**Exhibit 109**) telling them "this is still quite a long shot [but] things could heat up quickly (on a confidential basis and not in the pubic eye) if Kevin [O'Grady] is willing to play ball . . . .  I have a draft email to Doug Mansfield about pursuing an outright sale to the township through a Trust Fund grant this year that Jim Young is reviewing . . . ."

87.      YGW's Young responded Chown's draft, with his comments and suggestions later the same day, January 11, 2017 (**Exhibit 41, 41b**), saying:

> I like your email.  However, you may want to [missing content].  An outline of my comments are:
>
> 1.  you should include O'Grady as a recipient of your email
>
> 2.  You can emphasize that you will keep this confidential for now. Actually I do NOT want the general public to be aware of your current efforts since it could generate unwanted publicity.
>
> 3.  This is optional… but you could tell Doug that WHEN township involvement is needed or if a delay in the zoning process (i.e. another public hearing) is needed, then you can work with Jim Young to help in a "constructive way." Doug may not know my past involvement with the Conservancy and you are welcome to tell him.  Doug is a great professional and we have an excellent working relationship.  For example, I can work with O'Grady's attorney (currently Phil Settles in TC… but O'Grady may drop him) to help ensure that O'Grady is not harmed if the zoning hearing is delayed.  O'Grady should NOT want another public hearing at which the township discussed [sic] the environmental testing to be done. My goal is for the parties to enter into a written agreement regarding the testing to be done and then delay the public hearing until all results are evaluated.  Ideally, the property will be sold so no further zoning-related public hearings will be needed.  The key point is that I would be the "point of contact" on behalf of the township.
>
> 4. O'Grady should understand that the appraisal should be done PRIOR to the environmental assessment.  In fact, the sale should take place PRIOR to the assessment. If "hot spots" are found, then it would impact the land value and complicate things.
>
> 5. You should mention the environmental hold harmless as an option so that he understands that he "walks away clean" even if later studies show problems.
>
> 6.  I'd mention the interim buyer as an option so that he can get his money without a great delay.

33

7. Convincing Mansfield that a sale is a truly viable option is important.  The unknowns for O'Grady are the extent of environmental contamination, the cost of cleanup, the delay caused by cleanup and the fact that if the township wanted to "play hardball," then if the environmental testing shows are [sic] problem then the Township could lawfully DENY the zoning application and require O'Grady to reapply and start from the beginning ONCE THE CLEANUP IS COMPLETED … which means that he is facing a very hostile Board that will be as difficult as the law will allow.  I can explain this if you wish.  Plus the Township may be hiring a new planner and I have no idea of his competence or experience in complex projects like this.

Call me as needed. I am happy to talk to Doug after you meet with him or you can even reach me during your meeting if you decide that would be a good strategy.

87.1.    Obviously, YGW's intent in this email was to encourage Chown to present Plaintiff with two options – (1) sell to the Township, "walk away clean," "PRIOR to the environmental assessment"; or (2) "fac[e] a very hostile Board that will be as difficult as the law will allow," regarding which YGW had already threatened as its opinion that, "the township can require such testing or [sic] O'Grady refuses, then find that the "grading" standard has not been met."

88.    Having implemented many of YGW's suggestions, including the one to send the email directly to Mr. O'Grady (thereby facilitating direct pressure on O'Grady and The 81 by YGW in Young's own words, also thereby circumventing the 81's attorney in violation of MRPC 4.2(a)), and on January 12, 2017, Chown sent his email to Mansfield and O'Grady.  He then sent a copy to YGW's Young, stating "Made some tweaks, now fingers crossed (see below).  Will let you know if and when I get a response.  We'll see how stubborn and bull-headed Mr. O'Grady is.  I wish I knew exactly how much money he has into this right now."  **Exhibit 42**.

88.1.    YGW's Young then responded on January 12, 2017, "Good job with the email and best of luck!" and then requested further contact instructions.  **Exhibit 111**.

34

89.    Among the revisions to the draft Chown had sent to Young, which were in the final version sent directly to O'Grady, was the following language, containing the very veiled threats YGW had instructed Chown to make, to induce O'Grady to see a sale to Peninsula Township and GTRLC as a "win-win solution" (see **Exhibit 42**):

"PLEASE NOTE:  all email communications/discussions about the potential for an outright sale of the 81 property for conservation purposes should be kept between us and strictly confidential.  We do not want any publicity generated until such as time that we (the Conservancy and Kevin) have an agreement."

[Adding to paragraph numbered 3)] – "In fact, there are significant advantages to getting an appraisal done and selling the property for conservation purposes BEFORE a full blown environmental assessment is done and before the new Township Board makes a decision on Kevin's proposal that we should discuss."

"Furthermore, like we did when we helped Peninsula Township purchase the Bowers Harbor Park Addition from development partnership, we can indemnify and hold harmless for any liability related to the residual ag chemicals on the property through the BEA process.  You should be aware that there was significant lead and arsenic on the Bowers Harbor Park addition park addition which required not only a BEA but also a due care plan.  The good news is that recreational use standards are not as stringent as residential use standards which I can explain when we meet."

89.1.    Also on January 12, 2017, Chown emailed his management team, **Exhibit 110**, explaining regarding his email to Mansfield that "Jim Young suggested a few tweaks to the draft that I previously shared with you," and also stating, "O'Grady may completely blow my email **and dig in for the fight with the township** but nothing ventured, nothing gained. . . ."  Emphasis added. Obviously, Chown understood the situation – Plaintiff was being presented with the choice, under YGW's "win-win" strategy, to either sell to the Township, or "dig in for the fight with the township."

89.2.    Still more evidence of YGW's masterminding of the attempt to force Plaintiff to sell its property to his client is contained in the email sent a few days later, and on January 17, 2017, in

35

which YGW's Young again contacted Chown (**Exhibit 112**), with aggressive strategies that he characterized as a "second push," as follows:

> Would you like me to follow up with Mansfield? I can advise him that you inquired with me about the zoning status. Thereafter, it occurred to me that O'Grady really does not want environmental testing to show problems. This would result in the denial of the application and he would have to start over. Of course, he would request a delay in the processing of the current application and then come back to the Township once a cleanup has occurred. The problem is that the current Township Board is not likely to allow this..............and, as an attorney with zoning expertise, it is my opinion that the Township Board cannot be FORCED to grant a delay. I believe that O'Grady is more likely to believe Mansfield [than] if I communicated directly with O'Grady's attorney. Let me know if you want me to proceed with this "second push."

89.3.    The next day, and on January 18, 2017, Chown emailed the GTRLC Board of Directors, stating "we have been approached to provide assistance to Peninsula Township who is interested in purchasing the entire 81 acres." **Exhibit 113**.

90.    The Chown email was one attempt by Peninsula Township and GTRLC to induce Plaintiff and Mr. O'Grady to sell The 81's property to them, but it was by no means the only attempt. Over the next 14 months, up to and including during a February 28, 2018 meeting between Mr. O'Grady and Peninsula Township Supervisor Rob Manigold, Peninsula Township and GTRLC representatives continued to harangue Kevin O'Grady (regarding whom Chown had expressly speculated as to the extent of "how stubborn and bull-headed" he might be) with requests that amounted to, "have you had enough yet? Are you finally willing to sell to us?" These contacts included without limitation the following:

a.    January 31, 2017 – email from Glen Chown to O'Grady Attorney David Rowe, stating that "Jim [Young] wanted me to email a quick and dirty timeline of what steps would be required of Peninsula Township, working with the Conservancy, to secure a Michigan Natural Resources Trust Fund acquisition grant for the 81 property . . . ." **Exhibit 43**.

b.      December 28, 2017 – email from Township Attorney Greg Meihn to O'Grady Attorney David Rowe, stating "David, any update on meeting with Mr. O'Grady, Rob, and Grand Traverse Regional Conservancy.  Please let me know if your client is willing to talk."  **Exhibit 44**.

c.      January 4, 2018 – email from Township Attorney Greg Meihn to O'Grady Attorney David Rowe, stating "David, I plan to have the factual findings and Motion ready for execution by Monday for the Board at its meeting on the 9th.  Can you please update me on a meeting with Rob, Mr. O'Grady, and Grand Traverse Regional Conservancy.  These guys should get together to talk.  Please let me know."  **Exhibit 45**.

d.      January 11, 2018 – email from Township Attorney Greg Meihn directly to Kevin O'Grady – "Just finished a short meeting with the Township regarding the modification of the Findings of Facts and Motion that was proposed at the meeting. . . . I am meeting with certain Board members on Tuesday, January 16, regarding my Saturday draft. . . . Lastly, Mr. Rowe has informed me that you are not interested in meeting with Rob and the Conservancy regarding the property, and that you are desiring to move forward with the construction.  Could you please confirm I have your understanding correct?"  **Exhibit 46**.

e.      January 17, 2018 – voice mail message from Peninsula Township Supervisor Rob Manigold to Kevin O'Grady – "Hi Kevin Rob Manigold.  I was talking with Glen Chown from the Grand Traverse Regional Land Conservancy and Brad Bickle our Treasurer also.  Wondering if we could sit down with you sometime possibly Friday morning and just talk over some ideas and concepts and see what you would be maybe agreeable to or not.  We're not gonna bring our attorney or anything and I think they've contacted you as Greg our attorney has been trying to set the meeting up.  If that works for you or obviously we'll work at your convenience but Friday morning is open for all three of us.  If you could give me a call back at [phone numbers].  Hope you're having a good day.  Thank you, bye.

f.      February 1, 2018 – another voice mail from Manigold to O'Grady – "Hi Kevin Rob Manigold.  I hope you're back from vacation now.  Wondered if you still wanted to take Glen Chown and I up on having a conversation of uh things we possibly could work together on on 81.  But, uh, I hope everything's going well.  Probably the best way to get ahold of me is on my cell [number].  Thank you, bye."

g.      February 7, 2018 – another voice mail – "Hi Kevin Rob Manigold.  Just curious if you were back in town and wanted to get together with Brad or Glen Chown and I if it fits your schedule.  Glen's in Arizona I think he'll be back tomorrow night so uh we're free well obviously we'll work your schedule if you decide to give us a  call.

But you can call me at my cell [number] or my home phone is [number].  Hope everything's going well for you, uh talk to you later.  Thank you."

h.    February 28, 2018 – in a meeting between Mr. O'Grady and Peninsula Township Supervisor Rob Manigold regarding The 81, Manigold raised the issue of talking to GTRLC two to three times.

91.    On January 16, 2017, Otwell Mawby, the same firm that had produced the Vineyard Ridge analysis (**Exhibit 12**), authored an essentially identical "adverse impact" analysis regarding The 81 (**Exhibit 47**).  Therein, Otwell Mawby acknowledged the potential presence of lead and arsenic in the soil, although noting that they "accumulate in the upper soil horizon" because they are "immobile in the soil column."

92.    The Otwell Mawby report, **Exhibit 47**, also noted that such chemicals can result not only from agrochemicals used in orchards, but also can be naturally occurring (**Exhibit 47**, pp. 1-2). The essence of the Otwell Mawby opinion was "if the soils can be managed and contained onsite during grading and post grading operations, it can reasonably be concluded that the grading operations will not adversely affect the neighboring properties."  **Exhibit 47**, pp. 1-2.  Citing a "grading and stormwater plan [that] has been developed and engineered by Mansfield Land Use Consulting under the direction of a professional engineer registered in the State of Michigan," the approval of the plan by Peninsula Township Engineers Gourdie Fraser, referencing "GFA Review/Opinion Letters to the Township dated 9/27/16, 8/15/16, 3/15/16 and 3/8/16," and soil erosion approval by Grand Traverse County, the report concludes "there is little potential for adverse impact from stormwater runoff to the adjacent properties if the engineered, independently reviewed and permitted plan is adhered to."

93.     The Otwell Mawby report, **Exhibit 47**, also addresses the potential adverse impact from "wind born transport," observing that as with other projects such a problem is effectively managed by the application of water over areas where construction work is taking place or with a covering of gravel over transport roads.  "Construction dust is a common issue on any construction site and is readily managed."  **Exhibit 47**, pp. 2-3.

94.     This report was sent to Peninsula Township Engineer Boals on January 20, 2017 and to YGW's Young on January 25, 2017.  In the January 25 email forwarding the final draft to Young, (**Exhibit 48**) The 81's Attorney Philip Settles stated:

> Roger Mawby sent this out to the engineer, Brian Boals, on Friday PM, and we have not received a response.  It would seem a response would be forthcoming, insomuch as Boals was to undertake a proposal to satisfy substandard (k) in the first instance.  We thereafter waited 70 days for the engineer to make a proposal before having Mawby go ahead and actually do an impact assessment, specifically addressing the standard.  The letter assessment is fairly short and to the point.  Accordingly, I suspect the engineer has familiarized himself with the matter in sufficient detail to render an opinion as to whether he concurs or otherwise.  In this regard I would ask that you make contact with Boals to obtain an response.  Barring a response by this week I intend on making request a meeting [sic] without the engineer's response."

95.     On January 26, 2017, Attorney David Rowe emailed YGW's Young, explaining he had been retained by The 81.  He challenged Peninsula Township's right to review any environmental issues under Judge Rodgers' remand, and requested information and action given the lapse of time since the November 17, 2016 Peninsula Township Board meerting.  YGW forwarded this email to Boals and Manigold, with Young stating "[g]iven the contentious nature of this project, it is going to result in litigation no matter what the Township decides. . . .  We truly need a report from Brian [Boals] which gives us accurate background facts related to the use of toxins on the

property and a professional opinion regarding the environmental testing that should be done to determine if grading for the entire project could have an adverse impact." **Exhibit 49**.

96.     On January 30, 2017, Attorney Rowe emailed YGW's Young to inquire why he had solicited the input of the environmental expert of Attorney Howard and his client Komendera, with whom Peninsula Township was still litigating the initial approval of The 81's SUP at the Michigan Supreme Court, asking why "Grobbels, the 'opposition' Environmental Policy expert, was able to give input to the Township on the scope of the environmental testing." YGW'S Young responded that he wanted to look at all inputs, and "reach some sort of consensus as to the best approach . . . or we just litigate." **Exhibit 50**.

97.     On January 31, 2017, Boals, although admittedly having no experience with "preparation of due care plans for past agricultural uses to residential," **Exhibit 37**, but having gotten a boost from YGW's December 20 email with appellant Komendera expert Grobbels' opinions (**Exhibit 37**), sent YGW his draft letter re "environmental concerns," stating "I have been in contact with an environmental professional at another firm (James Harless at Soils and Materials Engineers (SME)) regarding this matter who has experience relative to ag chemical contamination so let me know if you would like to confer with him further." **Exhibit 51**.

98.     Unwilling to give any credence to the report of Otwell Mawby, YGW responded to Boals on the same day, providing additional specific and extensive instructions directed at setting the project up for an extensive environmental analysis. **Exhibit 52**. These included:

a.     An attempt to get Boals to say that "adverse impact to adjacent and neighboring properties" in § 8.1.3(3)(k) of the Township Zoning Ordinance, applied to not only to "neighboring land that is not part of The 81," but also, to "adjacent land in The 81 project."

40

b.  Suggestions as how to attack and "moot" the Otwell Mawby report.

c.  Stating, "I STRONGLY suggest that the environmental specialist at SME provide a separate report . . . and if he agrees with my statements regarding the potential adverse impact on lands within and outside of The 81, then it would be appropriate for him to state this as well.  He is welcome to call me if he has questions. . . .  Just yesterday, I explained to Rob that we should have a third party review and comment on the same subject matter as your report and Rob concurred.  My goal is to have the "record" in this matter which contains not just the reports or Grobbles (who works for the opponents) and Mawby or anyone else used by the developer, but to have 2 "neutral" or objective experts.  You are the township engineer and SME specializes in environmental issues.  This makes a perfect combo.  <u>I ask that Rob reply to all of us and authorize your use of SME</u>.

d.  "I hope to call you by tomorrow or Thursday regarding whether there are historical interpretations of § 8.1.3(k) that can be used to demonstrate that the Township has historically interpreted this section and the working "adjacent or neighboring" lands to mean NOT just land owned by third parties outside of a project, but also to land that is within a project and happens to be adjacent to lands that will be graded."

99.  Obviously, Young's use of quote marks around the word "neutral" was no accident – it signified that Boals and SME were indeed intended to *appear* neutral (as being in between Grobbels and Otwell Mawby) – but in Young's "win-win" plan combining YGW's "professional opinion" that Peninsula Township could force the spectre of environmental disaster and devaluation on The 81 with pressuring The 81 to sell its property to Peninsula Township and GTRLC, these "neutral" opinions were not neutral at all, but rather, further advocacy pieces in furtherance of Young's manipulations.

100.  Thus, it is not surprising that in this same email, YGW's Young also made specific revisions to Boals' language and sent the revisions back to Boals, shown by underline in a return draft (**Exhibit 53**), all in furtherance of Young's "win-win" strategy.  These revisions included:

a.  Boals letter (draft and final) acknowledges his numerous prior letters approving The 81's plans in regard to the issues remanded by Judge Rodgers, stating "we had found that the grading plans, private road designs, and storm water management systems

41

are in conformance with Township Standards and Ordinances for engineering design purposes.

b.      Then, Boals explains: "However, after the November 2016 public hearing for the project, the scope of our review was expanded due to concerns expressed regarding past use of agricultural chemicals (pesticides, fertilizers, etc.) on the site and whether site grading for the project as proposed create an adverse impact as it relates to residuals from this and past chemical use."

c.      To this, YGW's Young added: "This expanded review is consistent with section 8.1.3(k) of the Township zoning ordinance [which] requires a determination by the Township regarding whether grading or filling will adversely affect the adjacent or neighboring properties. Obviously, the Township needs accurate information and a professionally based analysis to assist in making this determination."

d.      YGW's Young also made other edits to Boals' letter, shown here and in **Exhibit 53** by underline:

e.      In our opinion, the mass grading operations being proposed for the project, while adequately designed from erosion control and storm water management standpoints, do have the potential to relocate and redistribute possibly contaminated soil materials on land that is adjacent to contaminated soil within the site and, depending on weather conditions, redistribution to neighboring. Such activity may be an exacerbation of the existing conditions, an adverse impact, and may violate rules under MDEQ Part 201.

f.      As a result, based on  it is recommended that an environmental assessment in accordance with the above referenced standards (AAI or Phase I) be conducted by an environmental professional prior to construction. Such an assessment will confirm whether the property is contaminated at levels exceeding MDEQ requirements and whether there are environmental 'due care' obligations under Part 201 to be met during the site construction process. In addition, the environmental assessment will help provide information that is needed to make a determination as required by the Township's zoning ordinance.

101.    Thereafter, YGW, Peninsula Township, and GTRLC continued to orchestrate the softening up of O'Grady and The 81 so they would give in, give up, and sell instead of develop. As soon as he received Young's edits, Boals incorporated them into his letter and sent it out, sending a copy to Young the next day (February 1, 2017) with an email, **Exhibit 54** , stating "[t]hank you

42

for the mark up, I can definitely agree with those suggested changes," and that, based on dust migration from one place to another, "I can honestly say the grading for the project could *theoretically* adversely impact lands within and outside The 81." Emphasis added. He also offered to coordinate efforts with SME.

102. Although the above reflects a lot of activity on January 31, 2017, the "win-win" strategy was being pursued on other fronts that day as well. As noted above, **Exhibit 43** is GTRLC's January 31, 2017 email to Mr. O'Grady's attorneys (with a copy to YGW), in which Glen Chown of GTRLC stated "Jim [Young] wanted me to email a quick and dirty timeline of what steps would be required of Peninsula Township, working with the Conservancy, to secure a Michigan Natural Resources Trust Fund acquisition grant for the 81 property. . . . [a]t the outset, I am very confident we can achieve a **win-win solution** . . . I do agree that there are advantages to pursuing this course of action sooner rather than later as I know you have been discussing with Jim [Young]. " Emphasis supplied.

103. This introduction was then followed by a detailed explanation of how all of that would work – again, reminding O'Grady of how, as YGW's Young put it, he "walks away clean," **Exhibit 41**, escaping the environmental box YGW was cleverly constructing, but only through the door Young had put in that box; i.e., the one that led to a closing table where Peninsula Township was given a deed to The 81.

104. On February 1, 2017, Boals made his introduction to James Harless at SME, sending Harless his letter and YGW's comments and instructions on the prior draft. Over the next few days, the two men organized further communications. **Exhibit 55**.

105.    On February 2, 2017, YGW's Young emailed Attorney Rowe.  **Exhibit 56**.  Despite the fact that Boals had already signed and sent his letter with all of YGW's edits, Young told Rowe that he had only "received a rough draft" of the Boals report.  He also told Rowe and that Boals was "having [his report] reviewed by a neutral environmental specialist" – of course, in correspondence to Rowe, he omitted the quote marks from the word "neutral" – because although he was making certain SME would be anything but neutral, he also wanted Rowe to believe SME really was neutral.

106.    YGW's Young went on, stating that "[i]t is my professional opinion that [under "8.1.3(k)"] that the Township can request such [environmental assessment] data," and continued:

> "Assuming that your client wants to proceed with processing of the special land use application, the options that I see currently are:
>
> 1.  If your client is willing to comply with the report of the township engineer, then your client can proceed on his own on a voluntary basis and the next hearing can be set once the results of the testing has been [sic] submitted to the Township as part of the record.  I probably would want a letter from you or your client proposing this approach so that the record is clear why no further hearings will be held until the results are submitted.
>
> 2. We can have a continuation of the hearing process and your client can agree on the record to have the testing done.  This seems like a waste of time and money as it can be done faster as described in #1.
>
> 3.  Your client can refuse to do the testing and we can continue with the hearing process.  Obviously, the engineer's report will be part of the record.  Then, the issue becomes whether there is sufficient evidence in the record that the relevant standard has been met."

107.    A week after Boals finished his report with Young's edits, and on February 7, 2017, YGW sent the report to Attorney Rowe.  **Exhibit 57**.

107.1.  The equal protection issues that are the basis of this suit, were already evident.  On the same day YGW sent the Boals report to Attorney Rowe, **Exhibit 57**, YGW's Young emailed his partner at YGW Peter Wendling, along with Peninsula Township's planner Gordon Hayward and

Peninsula Township Supervisor Manigold, **Exhibit 102**, Young doc. no 1049. He stated: "Attorney Rowe sent me this email and report [**Exhibit 12**] regarding Vineyard Ridge.  Rowe is claiming that The 81 is receiving unequal treatment. He said that no other development in Peninsula has ever been required to do the environmental testing that we are requiring of The 81. He sent this report regarding Vineyard Ridge.  Are there FACTUAL differences between the 81 and other developments (like Vineyard Ridge) which justify our position of demanding environmental testing…… as opposed to accepting a report like the one that Mawby submitted and which Rowe claims that the township accepted?  Is Vineyard Ridge a special use similar to The 81?  Have we required environmental testing for Uses by Right that have similar amounts of grading and development as the 81?  Please note that Rowe may have O'Grady switch to the Use by Right in an effort to avoid dealing with standard 8.1.3(k) which deals with grading and adverse impact.  Is there a provision in the ZO that would require such environmental testing for a Use by Right that has the same amount of grading and development as The 81 Special Use?  I have not been asked to research this within the ZO and Gordon may know the answer based on his extensive experience with the current ZO."

108.    The next wall of YGW's box was SME.  First, and consistent with the second point of his "game plan" set forth in the December 20, 2016 email to Boals (**Exhibit 37**) – getting the 81 to "voluntarily" test the property, YGW's Young emailed Rowe on February 8, 2017 (**Exhibit 58**) and described "what the Township's position would be if your client voluntarily did environmental testing," stating SME was also going to provide a separate report in addition to the Boals report, and "it is my hope that your client will voluntarily undertake such environmental testing which the experts of your client and the Township consider appropriate given the historical use of this property."

45

109. The next day, February 9, 2017, responding to emails from Boals and Peninsula Township Planner Brian VanDenBrand regarding contacting James Harless of SME, YGW's Young emailed Boals, VanDenBrand, and Peninsula Township Supervisor Manigold, with a copy to his law partner handling the Vineyard Ridge SUP, YGW's Peter Wendling. **Exhibit 59**. Regarding this additional "neutral" expert's review of The 81, Young stated:

> I am pleased that Harless has already started. Brian B. is welcome to give Harless my email and cell phone and even forward this email (which I recommend). If Harless wishes, I can initially talk with him. I want him to understand the zoning standard that we are using which is 8.1.3(k). It is CRUCIAL that he understand that this zoning standard deals with "adverse impacts on adjacent or neighboring properties." This means that our experts must evaluate the on-site conditions and whether grading could spread contaminated soils to nearby property via wind, rain or other mechanisms. You may want to send him a copy of it or you can ask Brian V. for an excerpt from the zoning ordinance or this section can be read at the Township's website. I just want to be sure that Harless understands exactly what we need, the position of the developer, and the fact that this project will most likely be litigated…. and the developer has hired experts that probably will oppose whatever our experts recommend… at least in terms of the proper steps [that] should be taken after we have the test results. I think that I have Rowe convinced that environmental testing MUST be done. If so, the fight will be about what happens once we have the results.

110. On February 14, 2017, YGW continued the crusade with a lengthy email from Attorney Young to Rowe, which he copied directly to Mr. O'Grady, as well as Peninsula Township officials, his law partner YGW's Peter Wendling, and Komendera Attorney Howard. **Exhibit 60**. Therein, Young stated: "It is my position that the remand requires the Township to 'start over' in its determination as to whether sec. 8.1.k is met. I am satisfied that this legal position is justified and would prevail if we litigate this issue. My Township Board and I had that opinion critically reviewed by [YGW's] Bryan [Graham] and [YGW's] Peter [Wendling] before I sent it. It would have been helpful if Judge Rogers had not retired. We could have filed a joint motion seeking clarification of the '/extent of his remand.' Please be aware that in its initial decision the township made absolutely

46

no findings regarding 'adverse impacts' under the relevant standard.  Under zoning law it must do so and this issue exists regardless of your position regarding the extent of the remand."

111.    As a cursory review of Peninsula Township's findings of fact, **Exhibit 3**, p. 24 shows, and as quoted in paragraph 11, above, YGW's claim that "in its initial decision the township made absolutely no findings regarding 'adverse impacts' under the relevant standard" was completely false.

112.    YGW's Young, copying his partner, Peter Wendling of YGW who was handling the Vineyard Ridge SUP, then continued with several further arguments including a specific reference to Vineyard Ridge (**Exhibit 60**):

   a.    On his reference to The 81 doing "voluntary" environmental testing, Young stated "I have used the word 'voluntary' intentionally.  I have told you and previous legal counsel of the developer that the Township must have the data to determine whether the 'adverse impact' aspect of this standard has been met and the developer has the burden of proof.  Thus, if the developer does not do any testing then it must be understood that I will advise the Township that since we have no data regarding potential 'adverse impacts on adjacent or neighboring properties,' then the developer has failed to meet his burden of proof and the township MUST, as a matter of law, find that the standard has not been met and deny the SLU application. . . . [The Township] simply can deny the application based on the applicant's failure to provide proof that this zoning ordinance standard has been met.  To that extent, the environmental testing is 'voluntary.'"

   b.    Young also reported that he was, at least for the time being, abandoning his prior position that "adjacent and neighboring properties" included lands within The 81 – Although this abandonment reflects the "stronger legal position," "it can be argued in good faith that the rules of statutory interpretation can lead to a different conclusion.  The question is which interpretation has the stronger legal basis and has the best chance of being sustained on appeal . . . Please understand that I have given you my interpretation as it stands today.  New information or further legal research could lead to a reevaluation of which interpretation is correct under the law."

   c.    Determined to justify The 81 being singled out as the only project in Peninsula Township history subjected to the scrutiny Young was imposing, he commented "[r]egarding the Township 'requiring' environmental tests in other cases, you already know that such testing was done in Vineyard Ridge.  I am told that the township

requests environmental information as part of the zoning process. I am attaching documents which the Planners provided me. One attachment shows the environmental tests that were done for The Orchards at Bower's Harbor and the other attachment is an application form which requests background environmental information and also included is a report related to Underwood Farms. I recently received those attachments as part of my own inquiry into past practices of the Township on environmental issues." For obvious reasons, however, the Otwell Mawby report on Vineyard Ridge (**Exhibit 12**) – which demonstrated the benign nature and easy manageability of residual agricultural chemicals in Peninsula Township soils – was not among the documents YGW chose to share.

d. In a further attempt to blunt the obvious unequal treatment of The 81, he then continued, "[p]lease understand that the townships historical practice is only one aspect of this issue. In determining whether the 'grading and adverse impact' provisions in section 8.1.3(k) are met, as noted above, it is my professional opinion that facts must be in the record. If the township has not requested this information in the past or has not done so on a consistent basis, my position is that this historical practice is subordinate to the major issue of complying zoning law. If a township historically has misapplied its zoning ordinance, then under the law this past practice does NOT result in unequal treatment when the township begins to interpret and apply its ordinance as required by law. I am not saying that Peninsula Township has misapplied its zoning ordinance in the past. My point is that a 'past practice' argument should not prevail given the legal principle that a municipality has the right and obligation to apply its ordinances consistent with the law even if it has not done so in the past. I have previously stated what, in my professional opinion, is required by law to properly determine whether there is compliance with the zoning ordinance standard cited above."

e. Then, Young completed his threats for the day, stating "I see two options regarding how to proceed in an efficient, cost-effective manner."

f. The first option set forth by Young was, "[f]irst, if your client wants an immediate hearing and does not wish to do environmental testing (as would be recommended by third-party experts), then please send a letter to the township with a copy to me. The letter should request an immediate hearing. The advantage to your client is that a prompt decision will be made on the zoning application and an appeal of a decision adverse to him can be promptly made. However, as stated above, without evidence or data in the record regarding 'adverse impact,' the burden of proof relating to this standard cannot be met."

g. Thus, Young told everyone involved – The 81, Peninsula Township, and Attorney Howard, that Young's personal directive on the matter was, that should The 81 fail to agree to environmental testing on its property, this necessarily meant that there would be insufficient "evidence or data in the record regarding 'adverse impact,'"

and therefore, "this standard cannot be met," and therefore, The 81's SUP application would be denied.  This can mean one of only two things – (1) Young had been told the Board's decision in advance; or (2) Young knew that the Board would do whatever he told it to do, or apparently regardless of anything that the Peninsula Township might decide independently of Young's directives.

h.      Young then set forth his second option – "[s]econd, we push to get the report from SME (the third-party environmental expert who was found by the Township engineer) on its recommendations related environmental testing.  I am told that the report is being prepared now.  You will be provided with a copy.  I will send a copy to Scott Howard as well.  If your consultants agree with the recommended testing, then the testing can proceed.  If your consultants disagree, then we should have a meeting with the environmental experts to see if a consensus can be reached.  Once the testing is done and if contaminated areas exist that could be impacted by grading and potentially cause adverse impacts to 'adjacent and neighboring properties,' then the environmental expert should provide recommendations regarding what the next steps should be, if any.   All of the final reports, including results and recommendations, would be part of the record."

112.1.  Although fully aware of the radical difference in treatment between The 81 and the Vineyard Ridge SUP he was handling, YGW's Wendling did not, at this or any other time, take action regarding the unequal treatment of The 81.

113.    Young's officious approach as reflected in the above email did not, however, extend to his client's appellate opponent – Komendera's attorney, Scott Howard.  Instead, and also on February 14, 2017, YGW's Young warmly invited Howard to get his expert directly involved in opposing the Otwell Mawby analysis for The 81.  As reflected in **Exhibit 61**, Young emailed Howard stating:

Attached is the Boals memo regarding which I would like [your environmental expert] Chris G's perspective.

Also, attached is a report that Settles sent me from Mawby.  I told Phil that the report did not really address the relevant standard in the ZO.

Please have your clients authorize Chris to interact with me (or, preferably both of us) and the environmental experts of the parties . . . especially, SME.

You have a right to be proud on all that you have accomplished and will accomplish professionally. It makes me smile to interact with another attorney whose career essentially parallels my past career . . . especially, when its an attorney whom I like and respect.

114. The next day, YGW's Young went to work on his other "neutral" expert, James

Harless. In a February 15, 2017 email (**Exhibit 62**), Young told Harless:

"It is important that you understand why your report is a crucial part of the Township's processing of this development and, also, that you understand the position of the developers consultants. Also, this project is opposed by a large number of citizens who have their own attorney and their own environmental consultant. Whatever decision that the township banks will be litigated by the losing side. Thus, it is crucial that the Township's decision be based on well reasoned reports by qualified environmental experts. . . .

The key section of the zoning ordinance (ZO) is section 8.1.3(K). Brian Boals sent you a copy of the ZO. You need only focus on that section. . . It would be extremely important to the Township if your report contained the following concepts:

1. based on your expertise and professional experience, if you agree that environmental testing is an appropriate meanings [sic] of determining whether "adverse impacts" could impact adjacent properties during grading, then please provide your professional opinion. You have accurate information regarding the historical use of the property in Brian Boals last report.

2. if you believe that the amount of the grading for this project or its location is of significance in determining whether an adverse impact could occur, then please state this.

3. if you know of any other law or regulation (excluding the ZO) that would be applicable to this property, given its historical use, please contact me and I may have you include it if legally relevant.

4. please state the "type" of environmental testing that should be conducted on a site like this.

Lastly, I would like your comments regarding all of the reports that we have from the experts obtained by the developer and the opponents. This should NOT be in your report. Such communication should be directly with me. If you disagree with any aspects of those reports, then I need to know it and the basis for your disagreement. I can then decide how and when to use this information. Note that environmental testing is only step one. Once we have the results, step two is a determination by the experts (with you being the key neutral expert) regarding what the next steps (such as remediation, altering locations of grading, etc.) should be, if any.

115. Also on February 15, 2017, YGW's Young emailed his former adversary and now ally Attorney Howard, providing copies of all environmental reports he had received, and apparently some of his legal analyses, and requesting assistance in requiring The 81 to perform a battery of environmental tests. **Exhibit 63**. In this correspondence, Young asks Howard for his and his expert's help in forcing The 81 to perform environmental testing – requesting perspective "on all of the reports. . . . As you know, it is my position that environmental testing must be done if the Township is to have sufficient data to determine whether the adverse impact portion of sec. 8.1.3(K) of the ZO has been met. **If you or [your expert] Chris know of ANY other law or regulation that would require such testing given the historical use of this property, please provide it to me.** Lastly, please send me ALL of the reports that Chris has completed for you I do not have digital copies and I cannot guarantee that the former planner sent me them." Emphasis added.

116. In response to a request from Attorney Rowe to move things along (it had now been three months since the November, 2016 meeting), and on February 20, 2017, YGW's Young emailed Rowe and stated "Mr. Harless hopes to have a rough draft ready within a few days . . . I was very impressed with Mr. Harless and his grasp of the issues. I want to thank Brian Boals for contacting him." **Exhibit 64**.

117. The next day, The 81's Attorney David Rowe emailed YGW's Young, as well as YGW's Wendling and YGW's Nicole Essad, asking for an update on the status of a pending report from Harless. YGW's Young responded to Rowe, arguing for "adverse impact" connected with grading – and falsely claiming that SME was retained because The 81 had disagreed with the Boals report. "You have questioned the reliability of the Boals report and, at my request, a second report by SME is being done on whether environmental testing should be done. . . .[and continuing with

justifying the testing]." Then, Young forwarded his adversarial email to Rowe, to Howard, stating "FYI" and "If you ever think that my reasoning is "questionable" in an email or during any discussion, please contact me. It is inevitable that this matter will be litigated" – the implication being, "and when it is litigated we will be on the same side, to force environmental testing, so let's keep working together." **Exhibit 65**.

118.    Six days later, on February 27, 2017, the Peninsula Township Planning Commission met to discuss the SUP/PUD application of Vineyard Ridge. A committee was appointed to review the application, and it was tabled for the time being. **Exhibit 66**.

119.    To further ensure the "neutrality" of Harless at SME, YGW's Young emailed further detailed advice and direction to him in email exchanges on March 2 and 9, 2017. **Exhibit 67**. Therein, the men discussed the applicability of Part 201 MDEQ standards, and Young made several suggestions that included:

a.    language usage "to make it easier for a Judge";

b.    suggesting testing locations be selected by Harless, "not leave it up to the developer";

c.    "Last paragraph – please add the following concept if you agree with it: environmental testing and "soil control plans" (my wording – please use standard terminology) are needed so that the township can make a determination under the zoning standard as to whether there would be adverse impacts on "adjacent and neighboring land" (take direct quote from 8.1.3.k). **I ask that this be added because** this [sic] **our only legal basis for requiring the testing and plans is this standard**. **I have provided a legal opinion that 8.1.3.k be interpreted this way** (given the historical use of the land, environmental contamination is an obvious potential "adverse impact") **and, unfortunately, the township has not applied the zoning ordinance exactly this way before** (but it has come close). To the extent that an expert with your professional expertise interprets the standard in a similar manner, such an expert opinion will reinforce my 'legal expert opinion'. . . . " [Emphasis added].

d.    Have you been given enough site plans (slopes, nearness of adjacent and neighboring lands to mention, grading locations, etc.) to discuss or note the following? IF there

are contaminated soils and grading disturbs those soils, then adjacent and neighboring lands could be 'adversely impacted' by the movement of the contaminated soils onto those neighboring lands by high winds, heavy rain (or any other factors that you can think of) during or after grading.  This simply reinforces the concept of 'adverse impact.'"

120.    The investment in ensuring Harless's "neutrality" came at a cost – as reflected in **Exhibit 68**, on March 6, 2017 Peninsula Township Engineer Boals approving a change order increasing Harless's budget from $1,750 to $3,000.  In support of his request, Harless explained, "I have expended additional research effort, prepared regulatory and regulatory applicability summaries for Jim Young at his request, and expanded the scope of my final opinion letter.  I have sent a draft of my opinion letter sent to Mr. Young, and he has provided initial comments.  He and I plan [to] talk soon about his comments.  If you get client pushback on the change order, you should know that I am billing at my normal professional rate, and not at my litigation support rate of $400.00 per hour."

121.    The next day, March 7, 2017, the Peninsula Township Vineyard Ridge Planning Commission subcommittee met and discussed the project.  **Exhibit 69**.  The meeting was attended by YGW attorney Nicole Essad.

122.    Again confirming that he had already decided the results at the next Peninsula Township Board public hearing if The 81 did not "voluntarily" agree to environmental testing, YGW's Young emailed Harless again on March 9, 2017, with a blind copy to YGW's Wendling (**Exhibit 70**), telling Harless to send his final report to Gourdie Fraser, and then Peninsula Township Engineer Brian Boals would "submit the report to the Township planners since he initially retained you."  He continued:

> I will provide copies to the developer's attorney and the attorney who represents a citizens group which opposes the project.  Each group has its own environmental consultant.  If either

wants to respond, they may do so.  I would rather that you see their comments PRIOR to a public hearing rather than hear their comments during the next public hearing … or in Court.

If the developer decides to undertake the testing, then I will encourage them to provide a 'testing site plan' so that you and Brian can advise the Township Board whether the testing locations are reasonable.  Depending on the test results, you can recommend the next step. If no further steps are needed, then a final public hearing will be set.

If the developer decides not to do testing, then I will ask the Township to set a public hearing.  I may need a supplemental report from you reemphasizing the importance of the testing in determining 'adverse impacts' and explaining what those 'adverse impacts' could be or ask that you attend the meeting**.  If no testing will be done, then the project must in my opinion be denied by the Township board and we go to Court.**  Thus, comments made at the public hearing and a supplemental report by you (or your live input) will be placed into the Township's findings of fact under the Zoning Ordinance and, thus, will be crucial since the judge will review the adequacy and reasonableness of those findings.

Emphasis supplied.

123.    On March 15, 2017, Harless issued his lengthy "neutral" opinion letter.  **Exhibit 71**. Therein, he treated The 81's property as an overall environmental hazard to human health, comparing the situation to the Flint water crisis.  In derogation of the type of even potential contamination, which goes no deeper than 2-3 feet into the soils, he discusses possible groundwater contamination.  The "neutral" expert closes his analysis with the statement that "[i]f the developer proceeds without appropriate assessment of environmental exposure risks and subsequent findings demonstrate that hazardous substances on the property result in unacceptable exposure to the residents, this development could cause excessive additional requirements, such as testing for lead in resident children's blood and response actions to mitigate exposures, for public agencies at public cost."  Also on March 15, 2017, the Peninsula Township Planning Commission Vineyard Ridge Working Committee met to consider "revised open space easement/site plans for the proposed Vineyard Ridge Planned Unit Development."  **Exhibit 72**.

54

124.    The next day, March 16, 2017, YGW's Young emailed Peninsula Township Supervisor Manigold, **Exhibit 73**, stating "See you Monday April 3 at 9 a.m.  Once the legal opinion is done, I may send it to you in advance so that the Board members can read it and have their questions ready for me.  As always, it is a pleasure working with you!  **I concur that The 81 must come to an end**."  Emphasis added.  This email was copied to YGW's Nicole Essad.

125.    On March 17, 2017, with the Harless opinion in hand, YGW's Young emailed Attorney Rowe and flatly threatened that "[u]nless O'Grady wants to do the testing, the next step is either litigation or the setting up of a hearing."  **Exhibit 74**.

126.    The same day, Harless sent YGW's Young an email, stating "At your request, I will clarify the second paragraph on page 3 of my opinion letter."  **Exhibit 75**.  Then, Harless stated:

> In my opinion, any responsible developer would undertake the necessary steps to determine if the health of future occupants, especially children, and neighbors of their development will be put at risk by residual contamination from the property's previous uses.  This is particularly pertinent for sites contaminated or potentially contaminated with lead, based on the scientific evidence for cognitive impairment from lead exposure, especially early in life, and the recent state and national attention focused on lead exposures arising from the Flint drinking water crisis.  **I am surprised that the developer of 81 on East Bay is resistant to addressing potential environmental issues on the site, especially considering that the criminal** and civil **proceedings** arising from the Flint crisis and the State of Michigan's proposed unilateral lowering of acceptable levels of lead in drinking water **clearly demonstrate the public's and state government's intense concerns about lead exposures**.

Emphasis added.

127.    On March 20 or 21, 2017, the Peninsula Township Planning Commission met and one of the agenda items of business (8.c.) was "Continuation of SUP #127 – Vineyard Ridge P.U.D." **Exhibit 76**.  A motion was unanimously approved "[t]hat application for Special Use Permit No 127, Vineyard Ridge Planned Unit Development Condominium Subdivision, be recommended for

approval to the Township Board." Several conditions were also recommended but none regarding any environmental issues. **Exhibit 77**. This meeting was attended by Attorney Nicole Essad of YGW.

128. With the Harless letter in hand, YGW was ready to push forward and have the first Peninsula Township hearing on The 81 since the prior November, 2016; and on March 21, 2017 YGW's Young emailed Rowe, copying YGW's Nicole Essad, regarding an April 6 hearing date. **Exhibit 78**. The email also states "Escrow – An escrow should be set up on Wednesday (tomorrow). It will be based on cost estimates from professionals such [as] us and the engineers. The escrow must be paid before the application can be processed further. It will apply only to FUTURE costs."

129. One of these "future costs" was litigation support from Harless at SME. **Exhibit 79** is an email exchange (March 23-24, 2017) between Peninsula Township Engineer Brian Boals and James Harless of SME, with Harless giving estimates for litigation support – increasing his budget of $3,000 as agreed on March 6, 2017 (**Exhibit 70**) to $6,000 – $8,000. He stated:

> In response to your voicemail, I put together some estimated costs. Please realize that these can change dramatically depending on the progress of litigation, the level of my involvement, whether or not I'm deposed, etc. Jim Young continues to ask for input so I anticipate this initial opinion and support phase may last a while. I would estimate that a budget of $6000 – $8000 will probably cover it. The fee schedule I sent you will apply.
>
> If I become involved more directly as an expert witness supporting litigation, my additional fees for this matter, which appears to be of limited complexity, could easily be $15,000-$30,000 through completion of a deposition. Those services will be billed in accordance with the attached litigation support fee schedule.

130. Thus, the escrow (an account funded by The 81 against which Peninsula Township would charge fees for Boals, Young, Harless, etc.) served, together with the imminent April 6 hearing date, as an additional threat to be used by YGW. In a March 31, 2017 email to Attorney Rowe (**Exhibit 80**), Young stated that the Peninsula Township Planner "felt that he had to leave an

adjournment decision to the Township Board.  I am meeting with the Township Board early on

Monday morning [April 3]."  He continued:

> I hope that by now, your client with input from this consultants will have made a decision regarding whether to do the environmental testing as recommended by Harless.  I need to know ASAP if a decision has been made . . . regardless of what the decision is.
>
> It makes no sense to take up everyone's time on April 6 if a legitimate basis exists for an adjournment, such as a decision to do the testing.  A prompt reply could avoid the costs related to preparation and attendance of me, the engineer and (maybe) Harless… All of which will be chargeable to the escrow.

131.    On April 3, 2017, YGW agreed to adjourn the April 6 hearing, and when Komendera

Attorney Howard emailed Young and asked about this, Young replied  "[y]es, adjourned to a date

to be set by planner.  I will explain when we talk."  **Exhibit 80**.  The next day, April 4, 2017, the

Michigan Supreme Court denied the leave to appeal Howard had requested against YGW's client,

Peninsula Township.  **Exhibit 9**.

132.    **Exhibit 81** includes an exchange of correspondence between Attorney Rowe and

YGW's Young, including an April 7, 2017 letter in which Rowe argues that Judge Rodgers' remand,

now law of the case and unappealable, was not a "do-over" as claimed by Young, and pointing out

that Harless did not even review the grading plans for The 81.  Young responded, puzzlingly, with

an email stating that the extent of Judge Rodgers' remand was "an esoteric issue."  Then, Young

forwarded Rowe's letter to his recently vanquished opponent, Scott Howard.  He copied Plaintiff's

owner Kevin O'Grady directly, as well as his law partner, YGW's Nicole Essad.

133.    On April 21, 2017, The 81 filed suit the Grand Traverse County Circuit Court in an

attempt to get a hearing to determine the scope of the actual issues that had been remanded by Judge

Rodgers.

134.    Four days later, on April 25, 2017, the Peninsula Township Board held a final hearing on the Vineyard Ridge SUP/PUD.  In advance of the hearing, Peninsula Township Planner Brian VanDenBrand emailed that developer's engineer, **Exhibit 82**, asking about the environmental reports summarized by Otwell Mawby in its report, **Exhibit 12**.  "Could you (or Otwell Mawby) please forward me the 2009/2010 Phase I, II, and BEA?  Not that it pertains to tonight but there are some people who have requested it.  I can't seem to find them."

135.    After a brief hearing, the Peninsula Township Board unanimously approved the Vineyard Ridge SUP, (**Exhibit 83**) with absolutely no environmental monitoring, testing, or mention of anything of the kind.  Page 8 of the findings of fact in the approval (**Exhibit 84**), contain the findings on § 8.1.3(3)(k) – the "adverse impact from grading" standard that YGW was using to beat The 81 into submission with its "neutral" experts (while YGW's Young was concurring that "The 81 must come to an end," see **Exhibit 73**).  In their entirety, the Board's § 8.1.3(3)(k) Vineyard Ridge findings, adopting the findings of the Peninsula Township Planning Commission, were:

> (k) that grading or filling will not destroy the character of the property or the surrounding area, and will not adversely affect the adjacent or neighboring properties.
>
> (1) The Commission finds that the plan as presented and as developed, will leave areas undisturbed during construction and afterward and shall be depicted on the site plan and at the site, per se.  (Exhibit 3)
>
> (2) The Commission finds that the development of the road is reasonable in the context of the existing topography and existing drainage patterns.  (Exhibit 3, 4)
>
> (3) The Commission finds that the applicant has submitted a grading plan with sufficient details to evaluate the plan for protection of the steep slopes and vegetation present on site.  (Exhibits 3, 4)
>
> (4) The Commission finds that the required SESC permits shall be submitted to the Planning & Zoning Department prior to the issuance of the SUP.  (Exhibit 1, 3)

58

(5) The Commission finds that as a condition of approval, and prior to any construction activity, the applicant shall install a snow fence or other suitable temporary barrier to delineate and protect areas to be left undisturbed during construction and afterward as depicted on the site plan (Exhibit 3).

**The above standard HAS been met.**

136.    Page 17 of the findings, **Exhibit 84**, reflect a "project review" by Brian Boals of Gourdie Fraser, issued on  March 15, 2017 – the same date that James Harless branded The 81 as akin to the Flint water disaster – with Mr. Boals being the "neutral" author of the first opinion letter alleging environmental health hazards at The 81 (see **Exhibits 53, 57**).

137.    On May 17, 2017, YGW's Young emailed Komendera Attorney Scott Howard, encouraging him to intervene in the suit filed against Peninsula Township by The 81.  **Exhibit 85**. He stated, in response to Howard's request for "documents that have been filed in" The 81 v Peninsula Twp., "I think that you should intervene in that case.  I know that [Peninsula Township litigation counsel] Tim W[ilhelm] wants to talk to you eventually.  He sent me a draft answer for my input and I will read it on Thursday.  I have not been actively involved except to provide background info.  Rowe and O'Grady have given the Plaintiff's law firm tremendously biased and inaccurate information."

138.    Eventually, the suit was dismissed without prejudice on the stipulation of the parties. Meanwhile, environmental testing was done by Otwell Mawby at The 81, and a report was issued on August 29, 2017.  **Exhibit 97** (omitting appendices).  This testing confirmed that the situation there was materially identical to that at Vineyard Ridge – no health hazards from dust inhalation, only eating the soil on a daily basis or direct and extended skin exposure.

59

138.1.  As noted, the environmental identity between Vineyard Ridge and The 81 was of great concern to and had already been discussed among the attorneys for Peninsula Township, in Young's 2-7-17 email to YGW's Wendling and others,  **Exhibit 102**, Young doc. no 1049, in which Young states "Attorney Rowe sent me this email and report [**Exhibit 12**] regarding Vineyard Ridge. Rowe is claiming that The 81 is receiving unequal treatment."

138.2.  By September 15, 2017, however, the equal protection concerns had reached critical mass.  In **Exhibit H** – a letter again copied to "Jim Young, Township Attorney," Peninsula Township Attorney Timothy Wilhelm, after explaining "my role is limited.  I am not replacing your Township Attorney, Jim Young, and I will likely not be attending the Board proceedings,"  warns, on page 8:

> I have serious concerns about the validity and legality of the Board reaching findings, imposing conditions, or denying The 81 SUP/PUD based on the presence of residual agricultural chemicals which fall within the agricultural exemption in Part 20101(1)(pp)(iv) meaning that The 81 would have no obligation under State law to remediate, clean up, or exercise due care in connection with its development of the property.  The Township's Zoning Ordinance does not include special land use standards that address environmental contamination or require remediation.

And at the bottom of page 8:

> The gist of The 81's position is that Vineyard Ridge has environmental and soil issues similar to those present on The 81 property, and yet the Board approved the Vineyard Ridge development in April, 2017.  Consequently, the Applicant argues the Board should approve The 81 development.  While I have not completed an exhaustive review of Vineyard Ridge, the similarities between it and The 81 project certainly raise equal protection concerns.

And on page 9:

> [T]he Vineyard Ridge development was approved in April 2017 by the same Board that will decide The 81's SUP/PUD application which likely eliminates, or at least undermines, the Township's ability to effectively distinguish The 81 from Vineyard Ridge on the basis of the decisions were made by differently composed Boards.

60

138.3. The above letter was copied to both YGW's Young and Peninsula Township's "neutral" expert, James Harless, for assistance in heading off the equal protection liability issues identified by Attorney Wilhelm.

139.    So, the next, post-testing SME/Harless report, made the best case possible to help YGW to fulfill its client's and its desire that "the 81 must come to an end," and taking issue with a report prepared and issued on September 5, 2017, by The 81's expert Andrew Smits of Inland Seas, **Exhibit 98** (omitting appendices), in which Smits further explained the identical nature of the environmental conditions at Vineyard Ridge and The 81, complete with charts demonstrating the similarities.  The first draft of the Harless letter, dated October 13, 2017, **Exhibit 86**, reflects the following:

   a.    Page 1:

   "Neither lead nor the target pesticide analytes were reported present in any of the soil samples at concentrations greater than the current (December 2013) or proposed (August 2017) Part 201 generic residential human direct contact or particulate inhalation criteria. Arsenic was reported present at concentrations greater than the current (7600 µg/kg) and proposed (9000 µg/kg) generic residential human direct contact criterion in 17 samples collected at 10 of the 15 sampling locations.  Arsenic exceedances of criteria reported in samples from all areas of the property where samples were collected and over one-half (8) of the deepest (6 to 12 inches) samples collected. **Arsenic was not present in any sample at a concentration greater than either of the aforementioned current or proposed generic residential particulate inhalation criteria**."

   b.    Page 2:

   "The reported concentrations of lead and the target pesticide analytes were sufficiently below the respective generic residential this criteria and were sufficiently consistent among the samples that the probability of a false negative finding of contamination for these contaminants is low. . . .

   When evaluating the assessment results within the regulatory risk management framework that applies to most contaminated sites in Michigan, it is clear that **soil on the property would pose a risk to human via the direct contact exposure pathway**.  The frequency

(66.6%) and distribution of sampling locations where direct contact criterion exceedances occurred indicate that a large area of the property is contaminated. . . .

In my opinion, the results from the referenced environmental assessment demonstrate that the levels of arsenic in soil on the Property are sufficient to adversely affect the adjacent or neighboring properties if contaminated soil escapes in the form of fugitive emissions (i.e., soil erosion) during construction via the following transport mechanisms:

> * migration of soil and other potentially contaminated materials and stormwater runoff;
> * generation and scape [sic] of airborne dust and other particulates; and
> * track out of soil, mud, etc. on vehicles and equipment."

c.      Page 3:

"Results of Inland Seas/Smits analysis "demonstrate that the assumption, based solely on historical use, that neighboring properties are similarly contaminated is unsupported; only valid site-specific assessment data can be used to determine soil characteristics with certainty.  Even if adjoining or neighboring properties have been impacted by pesticide residuals, migration of contaminated soil from the property will unacceptably add to the existing contaminant load. . . ."

Page 4:

 "[S]oil in the emergency access road easement, unless demonstrated otherwise by appropriate environmental assessment, should be considered contaminated at levels that potentially pose an adverse effect on adjacent and neighboring properties during grading and other road construction activities."

Page 5:

Regarding Mansfield proposed soil erosion and stormwater plans, "[N]ow that we know the site is contaminated, the level of detail presented for the design of the soil erosion elements for stormwater and windborne contaminated soil in the submitted plans is inadequate to demonstrate that the erosion control elements will prevent adverse effects on adjacent and neighboring properties per section 8.1.3(3)(k) of the Ordinance during grading and development."

Page 6:

Recommendations – "detailed, site-specific, erosion control plan (the Plan) incorporating best management practices to prevent the conveyance of sediment/soil via wind, stormwater runoff, or vehicle track-out transport mechanisms, or else the developer otherwise mitigate

the contamination on the property prior to grading and construction activities. . . . prevent, not reduce or minimize, fugitive emissions . . .  Only when the Plan is reviewed and approved by a professional engineer for Peninsula Township, or the arsenic concentrations are reduced to below generally accepted safe residential use levels, can prevention of adverse effects on adjacent or neighboring properties and compliance with section 8.1.3(3)(k) of the ordinance be assured.

Emphases added.

140.   Because of the essentially identical conditions at Vineyard Ridge, and in response to the plea for help from Attorney Wilhelm (**Exhibit H**) Harless did his best to say why The 81 was different – and he came up with a facially plausible explanation (see **Exhibit 86**, p. 3):

Mr. Smits also cites the Vineyard Ridge as a comparable comparison for evaluating what he claims are the Peninsula Town Board's differing concerns and actions regarding development of former orchard sites where elevated levels of arsenic have been reported. This is not a fair comparison because the Vineyard Ridge site was subject to regulation under Part 201 of the Michigan Natural Resources and Environmental Protection Act (NREPA) by virtue of the disclosure of a Baseline Environmental Assessment (BEA) report to the Michigan Department of Environmental Quality (MDEQ).  This disclosure made the site subject to Part 201 regulation as a site of contamination; therefore, grading and other development activities were subject to the non-exacerbation requirements of part 20107a, which require prevention of adverse effects such as exacerbation or contamination and threats to human health, on adjacent and neighboring properties. The Town Board could rely on the developer's statutorily required compliance with Part 201 due care obligations to ensure concurrent compliance with section 8.1.3(3)(k) of the Ordinance.  That same reliance is not available for the development of the Property because the developer has chosen to avail itself of the agricultural exemption of Part 201. The Town Board must determine whether the submission by the applicant meets the requirements of section 8.1.3(3)(k) of the Ordinance to prevent adverse effects to adjacent and neighboring properties.

141.   Although this explanation of the difference between The 81 and Vineyard Ridge was, as noted, facially plausible, it was based upon facts that did not exist.  Contrary to Harless's claims in his October 13, 2017 letter, Vineyard Ridge never was, and still is not, subject to Part 201 or MDEQ regulation.  The source of such a falsehood is unclear, especially given YGW's admission

in Young's March 17, 2017 email to Attorney Rowe, that Harless "acknowledged that under the current DEQ interpretation, Part 201 standards do not apply."  See **Exhibit 74**.

141.1.  Meanwhile, Attorney Wilhelm was again sounding the equal protection alarm.  On October 18, 2017, he issued another letter to YGW's Young and Peninsula Township officials, discussing (page 4) the prior failed attempt to distinguish Vineyard Ridge from The 81 with the false claim that Vineyard Ridge had been subject to MDEQ regulation, and warning "[i]f The 81 were to assert another Equal Protection claim based on the Vineyard Ridge comparison, the details of both developments and the Township's handling of them would certainly be a disputed issue subject to discovery and litigation, thus, there is risk in addressing the environmental issues on The 81 differently than Vineyard Ridge." **Exhibit J**.

142.  Within a week after his initial letter, Harless had corrected his error regarding Part 201 applicability, issuing a new letter dated October 20, 2017 (**Exhibit 87**) removing the section quoted in paragraph 140, above.  Yet, despite the critical need to find a distinction between The 81 and Vineyard Ridge, nothing was added to his letter, or anything else ever produced by Peninsula Township or its experts, to explain how The 81's soils were different in any respect whatsoever from the soils at Vineyard Ridge.  At his deposition in a later State court case in late 2018, Harless was still unable to come up with a single solitary difference between Vineyard Ridge and The 81.

143.  On October 20, 2017, the Peninsula Township Fire Department wrote to Peninsula Township Attorney Timothy Wilhelm, stating "[y]ou have requested further clarification regarding the Fire Code as it applies to the above reference residential development on dates and signs for the emergency access road.  Peninsula Township will not require gates on the emergency access road unless it becomes a problem with nuisance traffic.  If it does become a nuisance the developer will

be required to install gates at each of the emergency access road ends with proper locks approved by the fire department (Knox Lock padlocks)." **Exhibit 88**.

144.    On December 6, 2017, ASTI Environmental issued a 160+ page directive entitled "Soil Management Plan."  The initial 19 pages of this directive are attached as **Exhibit 89**. Consistent with Young's masterminding, page 2 of this report states "[s]pecifically, this plan is intended to address Peninsula Township Ordinance Article VIII Section 8.1.3(3)(k)."

145.    Page 7 of the ASTI report, **Exhibit 89**, states  "[t]he proposed construction grading activities intends [sic] to keep all soils on site.  However, concerns over the potential of off-site migration of impacted soil still exist; this plan intend to address these concerns with the specific intent of protecting adjacent or neighboring properties. . . . . Impacted soil on the subject property does not exceed the particulate soil inhalation clean up criteria.  However, the potential exists for offsite migration of arsenic contaminated dust, which would be considered an adverse effect and is prohibited under Peninsula Township Ordinance Article VIII section 8.1.3(3)(k)."

146.    The statements above are nonsensical.  ASTI is unqualified to render the legal opinion that dust that is not unsafe to breathe is "arsenic contaminated dust, which would be considered an adverse effect and is prohibited under Peninsula Township Ordinance Article VIII Section 8.1.3(3)(k)" – and such a conclusion is wrong, and baseless, in any event.

147.    Page 10 of the ASTI report, **Exhibit 89**, states  "[t]he prior environmental investigation has not identified any soil above an inhalation clean up criteria or screening level. However, concerns remain over offsite migration of impacted soil and the effect this may have on adjacent or neighboring properties."  Based upon this statement, the report then illogically requires

"[p]erimeter arsenic-contaminated dust monitoring" "implemented to ensure. . . that the contractor is in compliance with Township ordinance 8.1.3(3)(k)."

148.    On December 7, 2017, Andrew Smits of Inland Seas Engineering provided a full analysis of steep slope construction and erosion issues in a report entitled "Comparative Slope Evaluation Report, The 81 on East Bay Proposed Development, Peninsula Township, Grand Traverse County, Michigan." **Exhibit 90**.

149.    On December 12, 2017, the Peninsula Township Board met to consider the SUP of The 81.  The meeting minutes are attached as **Exhibit 91**; the draft decision and order and findings are attached as **Exhibit 92**.

150.    At pages 27-30 of the transcript, **Exhibit 93**, Harless stated:

Transcript pp. 27-30

DR. HARLESS:  Good evening.  James Harless with SME.  I was retained to take a look at the site to evaluate the potential for adverse effects on the properties.  That came about because the history of the property was it once was used for orchards.  And it's pretty well known in the environmental business that property that has been used for orchards, especially for a long time, is often contaminated with residuals of the pesticides that were used, particularly you find fungicides.  It's not uncommon to find arsenic and lead and potentially mercury.  There hadn't been any assessment done of the property at the time.  The consultant for the developer had appropriately recommended to them and opined that the site was not subject to part 201 based on an MDEQ interpretation of the statute that exempted agricultural products appropriately applied would not be a release from the standpoint of causing a contamination. The DEQ has interpreted that part of the law to basically say the property is exempt from 201, which is the part of the Michigan statute that regulates contaminated sites and says you have to clean them up or you don't.  So that being said, there is really no control over exposures on the site.  The developer did do an assessment of the property and did confirm that arsenic is present on the site at levels that if 201 applied they would exceed the levels that would be safe for general contact, people just coming in contact with the soil while living and working on the site.  As I said, that really doesn't pertain, you can't regulate that, you can't control that, but because there is high levels of arsenic on the property, it does create the potential for adverse effects if that contaminated soil leaves the property and is deposited on the adjoining or neighboring sites.  So we did determine that that was an issue. **The exposure issue on the site is direct contact.  The contaminants are below the level**

66

**that would be an issue if you inhaled the dust. So we are not so much worried about the exposure of people outside the site with dust being generated, but it's the material that could come off site either tracked out on vehicles, being discharged in dust generated during the grading and construction activities, or that might be washed off the site in storm water runoff and deposited on the adjoining properties.** [Emphasis added]. So that being said, we can't really -- we don't have regulatory control. I mean having the State of Michigan on the site, but the risk to adjoining and neighboring properties can be [m]litigated if the material stays on site. So the challenge is to come up with a performance criteria that says as a condition of doing the work, keep the contaminated soil on site. The second challenge is how you do that, and that is the soil management plan that was put together by ASTI that specifies really we want to use best management practices, do the best we can to keep that material on the site. You will never do it 100 percent, it's not technically feasible, but best management practices are to keep it to a minimal erosion discharge either by air tracking it out or through storm water runoff. So with that I will turn it over to Joe to talk about exactly how to accomplish that.

MR. MEIHN: Do you want to identify who Joe is for the public?

MR. MANIGOLD: Joe is our expert witness from ASTI.

151.    Then, as appears on pages 30-31 of the transcript, **Exhibit 93**, Joe Beutler spoke:

MR. BEUTLER: Good evening everybody. I am Joe Beutler with ASTI located at 10448 Citation Drive in Brighton, Michigan. Thank you all for having me here tonight. ASTI was tasked with developing a soil management plan that addressed Section 8.1.3(3)(k) of the Peninsula Township ordinance, specifically that grading or filling will not adversely affect the adjacent or neighboring properties. ASTI reviewed prior documentation to identify arsenic impacts on the property due to historic orchard operations. We reviewed development plans and the soil erosion sedimentation control plan. We also walked the property with the developer. ASTI understands that the primary transport mechanisms during grading and filling operations are storm water erosion, wind borne dust, or fugitive dust, and equipment egress or ingress, basically the access roads. ASTI has provided additional detail in the plan that goes above and beyond the soil erosion sedimentation control plan with respect to the following: Health and safety, dust control, predator monitoring, excavation soil handling, dewatering of soil, storm water handling, soil track out and soil stabilization, access roads, grading, soil piles and silt fencing. Additionally we recommend that a third party inspector or designated enforcing agent be retained by the township to monitor compliance with the soil management plan as well as the soil erosion and sedimentation control plan. ASTI believes that this soil management plan is a reasonable approach, and that by following this plan the developer will be in compliance with Section 8.1.3(3)(k).

151.1.  At subsequent deposition, Mr. Beutler, like Dr. Harless, had nothing to offer in regard to any possible difference between The 81 and Vineyard Ridge.

152.    One voice of reason was heard, at the end of the December 12, 2017 meeting – although it was ignored by Supervisor Manigold.  At page 161 of the transcript appears the following exchange, where Trustee Wahl questioned the reason behind treating The 81 so differently from another project – which Plaintiff is informed and believes was Vineyard Ridge:

> MR. WAHL:  My biggest concern is we have other properties and developments out here that have similar issues.  I don't see us requiring any of this of them.  I drive past one on the way to work and back every single day, and I don't see -- I don't even see any silt sheet there. I don't see them putting anything down.  I see grading taking place every day on that one, and yet we have no uproar there, but here it's great.  And I live right next to it.  I am concerned with this stuff.  I don't understand why we are requiring so much with one and not so much with the other concerns me personally.

> MR. MANIGOLD:  Okay.  Any other conditions or -- entertain a motion.

153.    The draft findings, **Exhibit 92**, contain numerous and onerous findings and requirements under § 8.1.3(3)(k), all as engineered by YGW.  Although the five findings under 8.1.3(3)(k) in the Vineyard Ridge approval took up less than half a page (see paragraph 135, above; **Exhibit 84**, p. 8), the 8.1.3(3)(k) findings for The 81 **Exhibit 92**, pp. 11-15 comprised 26 paragraphs and 4 full single-spaced pages.  Full compliance with the 160+ page ASTI report was required (e.g., p. 15, p. 19, conditions 10, 19).

154.    Also, in direct contravention of the Peninsula Township Fire Department's directive in **Exhibit 88**, condition no. 1 (**Exhibit 92**, p. 18) required immediate installation of gates and Knox boxes.  And, incredibly in light of Judge Rodgers' remand order, condition 16 (**Exhibit 92**, p. 19) stated "Developer to provide a grading and stabilization plan to Township engineer to be approved by Township engineer. . . ."

155.    Seven days later, the Peninsula Township Board held a meeting (minutes, **Exhibit 94**) at which the first items of business was "Approve Vineyard Ridge Sewer and Water Plan Documents." **Exhibit 94**, p. 1.

156.    During the discussion of Vineyard Ridge, Trustee Westphal expressed concerns that "we have seen massive earth moving occurring on the site," followed by a discussion of whether the developer had a soil erosion permit.  Township Engineer Jennifer Hodges then reported that "they do have a soil erosion permit," but "I have seen no indication of a storm water permit that has been issued by the State.  I personally feel that they need to obtain one . . . .  They are supposed to be in possession of the required permits and right now I do not see this as being the case." **Exhibit 94**, pp. 2-3.

157.    Trustee Achorn then inquired, "[s]hould there be cover on the grading right now," and Engineer Hodges replied, "[y]es, they should have done some winter seeding with a mulch blanket which stabilizes it.  I know that there are statements in the soil erosion permit stating this as well.  The county is also the enforcing agent.  It is their job to levy fines.  If they continue to be neglectful then you also have the authority to be the enforcing agent and issue violations." **Exhibit 94**, p. 3.

158.    Then, the following exchange occurred (**Exhibit 94**, p. 3):

Supervisor Manigold: "I believe the only violation is if soil leaves the site.  They can come in the spring and regrade it where they want it, but for a violation to occur, it had to go on someone else's property."

Engineer Hodges:      "Correct, it has to impact someone else's property."

Supervisor Manigold: "The ones that we deal with are the ones that it erodes and goes down someone else's property.  In the case where you have created a problem for someone else, that is when we or the county fines the contractor.  We may have to beef up our ordinances."

159.    Then, as reflected on **Exhibit 94**, pp. 3-4, ensued a discussion of how a SUP is good for a year and then expires – but not as to The 81 because Peninsula Township had approved it and then it went to court.    Immediately thereafter, the Vineyard Ridge matter was tabled, and the meeting went on to other matters.

160.    The above recitation further demonstrates the incomprehensibly disparate treatment received by The 81 at YGW's hands – even when Vineyard Ridge was operating without permits and was not remotely close to dealing appropriately with soil erosion issues, the Peninsula Township Board was unconcerned – and this, a *mere week* after it, under YGW's "win-win" plan supported by its "neutral" experts, had imposed upon The 81, 26 paragraphs of findings under § 8.1.3(3)(k), and required compliance with a 162-page soil management plan that included monitoring of dust emissions that all of the experts agreed are not even dangerous to breathe.

161.    While finalizing the findings of fact to be certified at a future meeting, Peninsula Township, having imposed upon a residential developer virtually impossible conditions, again turned up the heat on YGW's "win-win" plan – incessantly pestering Kevin O'Grady again and again with requests and suggestions that he exit Young's carefully constructed box through the "sell your property to Peninsula Township and the Conservancy here" door – as Young had put it, "walk away clean."  As noted above, these included emails from Peninsula Township Greg Meihn to Attorney Rowe on December 28, 2017 and January 4, 2018 (**Exhibits 44**, **45**); an email from Attorney Meihn directly to Mr. O'Grady on January 11, 2018 (**Exhibit 46**); and a voice mail message from Peninsula Township Supervisor Rob Manigold to Mr. O'Grady on January 17, 2018.

162.    On January 23, 2018, the Peninsula Township Board held another meeting (minutes, **Exhibit 95**), and certified the minutes from December 12, 2017, and issued the final "Decision and

70

Order on Remand," **Exhibit 96**, with all of the same requirements as, plus a few more than, the draft December 12 findings.

163.    Yet, the "win-win" "walk away clean" message continued to be delivered by Peninsula Township – with voice mails from Peninsula Township Supervisor Rob Manigold to Kevin O'Grady on February 1, 2018 and February 7, 2018, and in person on February 28, 2018.

164.    On February 21, 2018, The 81 filed a timely administrative appeal of the January 23, 2018 decision and order.  As YGW's Young had always said, and as he masterminded the entire matter, the only choices The 81 and Mr. O'Grady ever had, were (1) litigation, or (2) "walk away clean" with a sale of The 81 to Peninsula Township.

165.    The administrative appeal, and a concurrent lawsuit in Grand Traverse County (the "State Court Case") against Peninsula Township, Young individually, and the Grand Traverse Regional Land Conservancy, were eventually terminated, including by settlement between Plaintiff and Peninsula Township and GTRLC.

165.01.    The settlement between Plaintiff and Peninsula Township expressly preserved Plaintiff's claims against Young and YGW.

165.02.    The Equal Protection claims of Plaintiff against Young in the State Court Case were dismissed with prejudice upon a summary disposition motion filed by Young, based only and solely upon the ruling of the Grand Traverse County Circuit Court that Young, individually, had not been in charge of the Vineyard Ridge SUP.

165.03.    After the Grand Traverse County Circuit Court dismissed Plaintiff's claims against Young individually, Plaintiff filed a motion to amend its complaint to add YGW as a

defendant, because YGW had been in charge of both the Vineyard Ridge SUP and the SUP of The 81.

165.04.     The Grand Traverse County Circuit Court conducted a hearing on Plaintiff's motion to add YGW as a defendant in the State Court Case.  The Grand Traverse County Circuit Court, while expressly stating that it was not ruling that Plaintiff's claims against YGW were futile, because YGW had been in charge of both the Vineyard Ridge and The 81 SUPs, nevertheless denied the motion to add YGW as a defendant, ruling that adding YGW would be prejudicial to the other remaining defendant in the case, the Grand Traverse Regional Land Conservancy.

165.05.     Plaintiff then settled its claims against the Grand Traverse Regional Land Conservancy, which concluded the State Court case.  Additional facts regarding the involvement of Young, his partner in YGW Peter Wendling, and YGW in both The 81 and the Vineyard Ridge SUPs, follow.

165.1.  The Vineyard Ridge SUP was overseen by, and Peninsula Township was, in regard to its consideration and eventual approval of the Vineyard Ridge SUP, regularly advised by, Defendant YGW, including particularly Attorney Peter Wendling.

165.2.  However, it is clear that Attorneys Young and Wendling, and YGW, were directly involved in both Plaintiff's SUP and the Vineyard Ridge SUP.

165.3.  Documentary support for YGW's and Wendling's involvement with both Plaintiff's project and Vineyard Ridge is legion, and includes without limitation the following:

72

a.    **Exhibit 99**, Young doc. no. 3718[2], March 16, 2017 email from Attorney Essad at YGW to Supervisor Manigold and others, regarding billings for both projects.

b.    **Exhibit 24**, September 19, 2016, the Peninsula Township Planning Commission meeting regarding Vineyard Ridge.  Among the citizen comments at the September 19, 2016 meeting of the Peninsula Township Planning Commission were those of Laura Serocki.  The minutes (p. 3) reflect that she "was reading about disturbing soil with arsenic.  What about dust during construction and the health of workers and neighbors?"  In response, Peninsula Township Attorney Wendling explained simply that "[t]here would be dust control regulations as part of the construction code."

c.    **Exhibit 100**, Young doc. no 3771, Wendling email to Young regarding The 81 dated 10-14-16 – "Rob has not instructed me to look at the environmental study issue.  The big issue appears to be the fire road or lack thereof.  That issue I leave to you.  I have not seen any draft findings from Gordon and I think he is holding off pending a conversation with you."

d.    **Exhibit 101**,  Young doc. no 1706-07, Young email to Wendling dated 10-18-16 – re "Road Standards 81" – "the only remaining issue will be the Phase 1 & 2 Environmental Reports which pertain to the court remanded issues.  Phil is conferring with his client and planner to determine whether they will voluntarily submit these reports.  Unless something new arises, these appear to the only remaining issues."

---

[2]"Young doc. no 3718" means the document Bates number 3771 produced by Young in prior discovery proceedings in the State Court Case.

e.    **Exhibit 34**, November 30, 2016 Peninsula Township PC minutes, meeting to consider whether Peninsula Township should amend its ordinance "making a BEA [Baseline Environmental Assessment] an application requirement for all PUDs, Subdivisions, and Site Condominiums." Exhibit 34, p. 2.  These reflect Wendling stating "chemicals were often used in the orchards (arsenic), so there is a history of potential contamination on these sites from ag chemicals.  He doesn't see a problem to have a baseline as part of the requirement for the app in order to protect health and wellness. It can definitely be justified.  Other townships have that provision in their ordinance."  Also considered was the question "can we simply add BEA in the application check list by asking for a copy of a BEA if one exists," and Mr. Wendling responded "It can be done either way - the check list can be incorporated as part of the ordinance.  It can be a required item you need to submit for a PUD / SUP." Exhibit 34, p. 2.  The clear import of these discussions was that no BEA or environmental review was, as of November 16, 2016, required of any SUP, PUD, or development, either by ordinance requirement or any "application check list."  Page 5 of the November 30, 2016 minutes (Exhibit 34), reflect another discussion point – "[c]onsider scheduling a December or January public hearing for SUP #127 [Vineyard Ridge].  Mark Nadolski, President of Protect the Peninsula, as he had done in the past, asked the Township Planning Commission "[i]s the PC requiring environmental studies on this project," and was assured by Attorney Wendling, that "yes, they did a complete one."  The minutes also reflect that a "study performed was

related to soil contaminants study from previous ag on this site . . . they fully intend to comply with all recommendations from that study."

f.    **Exhibit 102**, Young doc. no 1049, Young email to Hayward, Manigold and Wendling dated 2-7-17 – "Attorney Rowe sent me this email and report regarding Vineyard Ridge.  Rowe is claiming that The 81 is receiving unequal treatment.  He said that no other development in Peninsula has ever been required to do the environmental testing that we are requiring of The 81. He sent this report regarding Vineyard Ridge.  Are there FACTUAL differences between the 81 and other developments (like Vineyard Ridge) which justify our position of demanding environmental testing…… as opposed to accepting a report like the one that Mawby submitted and which Rowe claims that the township accepted?  Is Vineyard Ridge a special use similar to The 81?  Have we required environmental testing for Uses by Right that have similar amounts of grading and development as the 81?  Please note that Rowe may have O'Grady switch to the Use by Right in an effort to avoid dealing with standard 8.1.3(k) which deals with grading and adverse impact.  Is there a provision in the ZO that would require such environmental testing for a Use by Right that has the same amount of grading and development as The 81 Special Use?  I have not been asked to research this within the ZO and Gordon may know the answer based on his extensive experience with the current ZO."

g.    **Exhibit 58** – February 8, 2017 Young email to The 81's attorney Rowe, blind copied to Wendling, describing "what the Township's position would be if your client voluntarily did environmental testing," stating SME was also going to provide a

separate report in addition to the Boals report, and "it is my hope that your client will voluntarily undertake such environmental testing which the experts of your client and the Township consider appropriate given the historical use of this property," and **Exhibit 59**, February 9, 2017 email from Young to James Harless of SME and Wendling – "If Harless wishes, I can initially talk with him. I want him to understand the zoning standard that we are using which is 8.1.3(k). It is CRUCIAL that he understand that this zoning standard deals with "adverse impacts on adjacent or neighboring properties." This means that our experts must evaluate the on-site conditions and whether grading could spread contaminated soils to nearby property via wind, rain or other mechanisms. You may want to send him a copy of it or you can ask Brian V. for an excerpt from the zoning ordinance or this section can be read at the Township's website. I just want to be sure that Harless understands exactly what we need, the position of the developer, and the fact that this project will most likely be litigated…. and the developer has hired experts that probably will oppose whatever our experts recommend… at least in terms of the proper steps [that] should be taken after we have the test results. I think that I have Rowe convinced that environmental testing MUST be done. If so, the fight will be about what happens once we have the results."

h.    **Exhibit 60**, February 14, 2017 email from Young to Plaintiff's attorney Rowe, which he copied directly to Mr. O'Grady, as well as Peninsula Township officials, his law partner Wendling, and Komendera Attorney Howard, stating "[i]t is my position that the remand requires the Township to 'start over' in its determination as to whether

76

sec. 8.1.k is met.  I am satisfied that this legal position is justified and would prevail if we litigate this issue.  **My Township Board and I had that opinion critically reviewed by [YGW's] Bryan [Graham] and [YGW's] Peter [Wendling] before I sent it.**  Please be aware that in its initial decision the township made absolutely no findings regarding 'adverse impacts' under the relevant standard.  Under zoning law it must do so and this issue exists regardless of your position regarding the extent of the remand."  Emphasis supplied.

i.  **Exhibit 103**, Howard doc. no. 81, 3-17-17 Young email to Howard, YGW's Essad, YGW's Wendling, and Rowe – forwarding engineer Boals' forward of Harless report, "next step is to find out whether the developer elects to provide the requested information."

j.  **Exhibit 104**, Young doc. no 1820, Young email to Wendling, Essad, cc Van DenBrand, Manigold dated 3-17-17 Forwarding "Clarification of Opinion Letter – 81 on East Bay" (Harless, above 1077, **Exhibit 75**, in which Harless accuses The 81 of criminal conduct) – "Nicole and Peter – FYI IF you need this for future litigation and can find a way to read it to a Judge.  Rob and Brian – We need to talk on Monday. . . . They are likely to start litigation soon . . ."

k.  **Exhibit 14**, **15** – Peninsula Township PC minutes of special and regular meetings, with YGW's Wendling in charge of discussions regarding both The 81 and Vineyard Ridge projects.

l.  **Exhibit 25** – September 28, 2016, the YGW billing statement, reflecting charges for an "interoffice conference regarding the inquiry about environmental studies."  As

noted, the bill is a firm bill that does not set forth individual attorney or staff timekeepers, rates, or hours.

m.     **Exhibit 36** – December 10, 2016 email from YGW's Young to The 81's attorney Philip Settles, explaining that his "win-win" opinion had been "reviewed by [YGW's] Bryan [Graham] and YGW's Peter [Wendling] and sent to Township."

n.     **Exhibit 70**,  March 9, 2017 email from YGW's Young to James Harless, and blind copied to YGW's Wendling, stating "I may need a supplemental report from you reemphasizing the importance of the testing in determining 'adverse impacts' and explaining what those 'adverse impacts' could be or ask that you attend the meeting**. If no testing will be done, then the project must in my opinion be denied by the Township board and we go to Court**."  Emphasis added.

o.     **Exhibit 73**, March 16, 2017, email from YGW's Young to Peninsula Township Supervisor Manigold, stating "See you Monday April 3 at 9 a.m.  Once the legal opinion is done, I may send it to you in advance so that the Board members can read it and have their questions ready for me.  As always, it is a pleasure working with you!  **I concur that The 81 must come to an end**."  Emphasis added.  This email was copied to YGW's Nicole Essad.

p.     **Exhibit 74**, March 17, 2017 email from YGW's Young to Attorney Rowe, threatening that "[u]nless O'Grady wants to do the testing, the next step is either litigation or the setting up of a hearing."  This email was copied to both Nicole Essad and Peter Wendling, at YGW.

78

q.    **Exhibit 78**, March 21, 2017 email from YGW's Young to The 81 attorney Rowe, copying YGW's Nicole Essad, regarding an April 6 hearing date and imposing an escrow account on Plaintiff.

r.    **Exhibit 81**, April 10, 2017 respons by YGW's Young to The 81 attorney Rowe, copied to YGW's Nicole Essad.

165.4. In sum, as shown above, at least four of the members and/or shareholders and/or attorney employees of Defendant YGW were intimately involved with both Plaintiff's SUP and the Vineyard Ridge SUP, and thus would or should have been fully aware of and involved in the unequal treatment of the two projects.

165.5. Accordingly, to the extent that Plaintiff's Equal Protection claim (and the associated conspiracy claims based upon the joint plan of YGW, Peninsula Township, and GTRLC to violate Plaintiff's Equal Protection rights) are dependent upon claims against a Defendant that was involved in both The 81 SUP and the Vineyard Ridge SUP, such Equal Protection claim is valid as asserted against YGW.

165.51.    Following are additional facts supporting Plaintiff's Equal Protection and Conspiracy claims.

165.6. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law. Anyone whose conduct is 'fairly attributable to the state can be sued as a state actor under § 1983.' " *Filarsky v. Delia*, —— U.S. ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012) (internal citation omitted). "It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state

to engage in concerted activity, are regarded as acting 'under the color of state law' for the purposes

of § 1983." *United Pet Supply, Inc v City of Chattanooga, Tenn*, 768 F3d 464, 478 (CA 6, 2014).

165.7.  The conduct complained of herein, of Defendant YGW and GTRLC, is fairly

attributable to Peninsula Township – including without limitation that they all were attempting to

force Plaintiff to sell its property to Peninsula Township.  Also, these entities jointly participated

with Peninsula Township to engage in concerted activity.

165.8.  Moreover, "an otherwise private person acts "under color of" state law when engaged

in a conspiracy with state officials to deprive another of federal rights. *Tower v Glover*, 467 US 914,

920; 104 S Ct 2820, 2824; 81 L Ed 2d 758 (1984).

165.9.  Defendant YGW and GTRLC engaged in a conspiracy with Peninsula Township to

deprive Plaintiff of federal rights.

165.10.        There are several ways to prove that a private actor's conduct should be

attributed to the State.  One way is to show that the State coerced the private actor into committing

the constitutional violation.  Another way is to prove that the private actor was "a willful participant

in joint activity with the State or its agents." *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)

(quotation marks and citation omitted). *Donelson v Sweet*, No. 3:14-CV-155-CWR-FKB, 2015 WL

9594289, at *3 (SD Miss, December 31, 2015).  Thus, an actual "conspiracy" as defined under law

is not necessary.  "It must be pleaded that a private entity and state actors carried out a deliberate,

previously agreed upon plan, <u>or</u> that their activity constitute[d] a conspiracy or meeting of the

minds.*" Johnson v City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y., 2009).  Emphasis added.

165.11.        Also, in a suit against "private individuals for actions taken in their roles as

attorneys, [the plaintiff] must point to some action that is 'fairly attributable' to the state. . . .  A

person may be found to be a state actor when (1) he is a state official, (2) 'he has acted together with or has obtained significant aid from state officials,' or (3) his conduct is, by its nature, chargeable to the state*." Angelico v Lehigh Valley Hosp, Inc*, 184 F3d 268, 277 (CA 3, 1999).  "The main focus of the inquiry is to determine whether the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed in the authority of state law." *Lucarelli v Norton*, No. 4:06-CV-53, 2006 WL 709319, at *3 (MD Pa, March 17, 2006).  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents. *Adickes v S H Kress & Co*, 398 US 144, 152 (1970).

165.12.     Defendant YGW and GTRLC were willful participants in joint activity with Peninsula Township or its agents, irrespective of whether such joint activity meets the definition of conspiracy, having obtained significant aid from Peninsula Township officials, and they either directly and/or through their co-conspirators exercised power possessed by virtue of state law and made possible only because they or their co-conspirators were clothed in the authority of state law.

165.13.     A lawyer whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983. *Todd v Skrah*, No. 1:17-CV-00738-CL, 2017 WL 3429400, at *4 (D Or, June 19, 2017), report and recommendation adopted as mod No. 1:17-CV-00738-CL, 2017 WL 3429387 (D Or, August 8, 2017).  If a private attorney has conspired with a state actor to deprive a person of his constitutional rights, then the private attorney may be held liable pursuant to 42 U.S.C. § 1983. *Lewis v Rafferty*, No. 1:17-CV-313-LG-RHW, 2018 WL 2145012, at *1 (SD Miss, May 9, 2018).  "It is well settled that an attorney is not a state actor for purposes of section 1983 by virtue of being licensed by the state and otherwise working in the highly regulated profession. . . .  An

81

attorney may become a state actor, however, by conspiring with a state official to deprive a person of his or her constitutional rights." *Pellegrino Food Products Co, Inc v City of Warren*, 136 F. Supp. 2d 391, 409 (W.D. Pa. 2000)

165.14.    Based upon the facts pleaded and expected to be discovered, and based upon the law cited herein, YGW's conduct is fairly attributable to Peninsula Township.

165.15.    "A municipality's attorney becomes a state actor by going beyond the traditional attorney-client relationship.  For instance, a plaintiff states a viable § 1983 claim against an attorney who goes beyond making recommendations and decides official government policies. See *Frompovicz v. Twp. of S. Mannheim*, No. 06–2120, 2007 WL 2908292, at *8 (M.D.Pa. Oct.4, 2007) ('Establishing the criteria for permit applications and evaluating those applications are clearly activities that have their source in state authority.  Defendant [attorney], in establishing the standards by which to judge permit applications, would in all fairness be considered a state actor.  He carried out a duty mandated under local government authority, establishing standards that applied under local law.'); see also *Willis*, 2008 WL 644762, at *6 (characterizing Frompovicz as 'holding that a township solicitor acted under color of state law when he exercised policy-making authority')." *Majer v Twp of Long Beach*, No. CIV.A.06-2919MLC, 2009 WL 3208419, at *9 (DNJ, September 30, 2009) See also *Belkowski v Kruczek*, No. 209-CV-1549, 2010 WL 1433099, at *3–4 (WD Pa, April 7, 2010)(same holding).

165.16.    YGW clearly went "beyond the traditional attorney-client relationship" when it engaged in "deciding official government policies" and "establishing the standards by which to judge permit applications."  By way of example only, this is evidenced by

a.    YGW's Wendling declaring (see ¶¶ 54, 165.3.b., *supra.*, and Exhibit 24) at the September 19, 2016 meeting of the Peninsula Township Planning Commission that that "[t]here would be dust control regulations as part of the construction code" in response to Laura Serocki's concerns regarding "disturbing soil with arsenic" and "dust during construction and the health of workers and neighbors" – versus

b.    As set forth in paragraph 112, *supra*, and **Exhibit 60**, YGW's Young threatening The 81's Attorney David Rowe that "if the developer does not do any testing then it must be understood that *I will advise the Township* that since we have no data regarding potential 'adverse impacts on adjacent or neighboring properties,' then the developer has failed to meet his burden of proof and *the township MUST, as a matter of law, find that the standard has not been met and deny the SLU application. . . .*" Emphasis supplied.  These are not advisory opinions – they are YGW telling the township exactly what to do – deny the SLUP – in direct violation of Judge Rodgers' opinion prohibiting such delegation or usurpation of the Board's responsibility to make its **own independent decisions – and in a directly opposite manner – with threats and intimidation and violations of rights of Plaintiff – to the permissive policy making of YGW in regard to Vineyard Ridge.**

c.    YGW's acting on its own, without communicating with its client Peninsula Township, in coordinating GTRLC's and Chown's efforts to force the sale of Plaintiff's property to its client, providing Chown legal advice as to how to go around Plaintiff's attorneys, communicate directly with Mr. O'Grady, and pressure Plaintiff to sell to its client, and on the other side, providing legal advice to Peninsula

Township regarding forcing environmental testing only on The 81 to pressure Plaintiff to sell, all while excluding Peninsula Township and Supervisor Manigold from the communications with Chown and GTRLC and not taking any direction from Peninsula Township or Manigold or informing Peninsula Township or Manigold of its actions regarding GTRLC, because so doing would, as YGW's Young put it, open them up to claims that this would "contaminate" their decision-making process and raise potential liability or conflict of interest problems." This all occurred at the same time that YGW admitted that "it would not be appropriate for [Chown] to work directly with [Manigold] or the Township Board since all of [Peninsula Township Board] are operating in a 'quasi-judicial' capacity in deciding the special land use application," such that "O'Grady [could] claim that [Manigold] or the Township Board are manipulating the zoning decision to force him to sell or impact a sale price." **Exhibit 107**, **Exhibit 108**. Such freelancing is akin to a Mafia Capo, who acts in accordance with what he knows to be the wishes of his mob Boss, all while ostensibly acting alone to give the Boss deniability. This, again, is "beyond the traditional attorney-client relationship."

165.17.    As also alleged in this complaint, Plaintiff claims that YGW "masterminded" the scheme to force Plaintiff to sell its property to its client, Peninsula Township, by threatening to violate and violating Plaintiff's Equal Protection rights and improperly impose environmental requirements on Plaintiff that had never before been required of any permit applicant. These allegations are fully and factually supported by the affidavit of Plaintiff's engineer Doug Mansfield, **Exhibit F**, who stated under oath that Young had in a conversation with him expressed

84

his frustration with other members of his firm and their involvement with the approval of the SUP for the Vineyard Ridge project.  He said that the reason for his frustration was that the two projects could not have been more similar in nature of use, level of arsenic in the soils, and location in Peninsula Township.  He observed that they were both subject to approval (at the same time) before the same Township Board, and was upset that while *he had been trying to stop the development of The 81,* the Board and other members of his firm had approved a substantially identical project in Vineyard Ridge.  He viewed the approval of Vineyard Ridge as defeating *his efforts to stop The 81 from being developed.*  He was appalled by what he saw as the lack of foresight and communication on these issues, using words to the effect of "the path just reversed and now I have an uphill climb."

Emphasis added.  Here again, trying to stop a development from happening, is way, way "beyond the traditional attorney-client relationship"

165.18.    In sum, YGW "trying to stop the development of The 81" and "efforts to stop The 81 from being developed," consistent with YGW's Young stating "I concur that the 81 must come to an end," **Exhibit 73**, March 16, 2017 Young email to Manigold, go "beyond the traditional attorney-client relationship."  In addition to the above-cited case law, it has been specifically held that trying to stop a project from happening is indeed going "beyond the traditional attorney-client relationship."  "The conduct alleged—masterminding the alleged conspiracy to block Advantage Point's project and deny it use of the main—is not within the traditional functions of legal counsel. Accordingly, Plaintiff has adequately alleged that the Barley Snyder Defendants acted under color of state law." *Advantage Point, LP v Borough of Kutztown*, No. 5:14-CV-05517, 2016 WL 6915318, at *8 (E.D. Pa. March 25, 2016).  See attached case, **Exhibit 105.**

165.181.    Additional facts in avoidance of a defense of immunity follow.

165.19.    The foundation case for "class of one" Equal Protection claims, especially in the context of permit applications, is *Vill of Willowbrook v Olech*, 528 U.S. 562, 563–65 (2000), the United States Supreme Court set the applicable standard:

Respondent Grace Olech and her late husband Thaddeus asked petitioner Village of Willowbrook (Village) to connect their property to the municipal water supply.  The Village at first conditioned the connection on the Olechs granting the Village a 33-foot easement.  The Olechs objected, claiming that the Village only required a 15-foot easement from other property owners seeking access to the water supply. After a 3-month delay, the Village relented and agreed to provide water service with only a 15-foot easement.

Olech sued the Village, claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection Clause of the Fourteenth Amendment.  Olech asserted that the 33-foot easement demand was "irrational and wholly arbitrary"; that the Village's demand was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village; and that the Village acted either with the intent to deprive Olech of her rights or in reckless disregard of her rights. App. 10, 12. . . .

Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. . . .  In so doing, we have explained that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' "

That reasoning is applicable to this case. Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners.  See *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15-foot easement.  These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis.

165.20.     The Sixth Circuit has ruled similarly.  See *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004)(In selective enforcement cases, "a plaintiff must demonstrate that a government actor had a bad reason for enforcing the law against her and not against a similarly situated party," or "that the action had no rational basis").

165.21.        *Olech*, *Boone*, and the other cases set forth above, do, and at all times relevant hereto did, reflect clearly established law, which Defendant YGW violated.

165.22.        In a §1983 action, the "threshold question whether the defendant's undisputed conduct violated clearly established law." *Guider v Smith*, 431 Mich. 559, 571; 431 N.W.2d 810 (1988).  Accord, *Lavigne v Forshee*, 307 Mich. App. 530, 544; 861 N.W.2d 635 (2014).  Here, as in *Advantage Point*, Plaintiff's "allegation that each of the attorneys participated in the scheme plausibly alleges that each took action that violated clearly established law, which is sufficient to preclude each of them from being protected by qualified immunity." *Advantage Point, LP v Borough of Kutztown*, No. 5:14-CV-05517, 2016 WL 2910164, at *3 (ED Pa, May 19, 2016)(**Exhibit 105).**

166.    Thus, there is no immunity for YGW in this case.

167.    Plaintiff's request for SUP/PUD was treated completely differently than any other request in the history of Peninsula Township; and in particular, differently than Vineyard Ridge's SUP/PUD, including by the imposition of numerous expensive, unique, and unnecessary requirements and conditions, all as set forth in detail in the preceding paragraphs.

168.    Plaintiff is informed and believes that the reasons for this unfair and disparate treatment were the animus and prejudice of Peninsula Township Board members against The 81 development, and their opposition, not only to the specific SUP/PUD proposed by The 81, but also, any development at all of the property of The 81, all as alluded to by Supervisor Manigold in the news articles attached as **Exhibit 19**, and all as implemented by YGW.

169.    Further, and equally important, Plaintiff is informed and believes that a major and perhaps the principal reason for this unfair and disparate treatment, was the improper desire of

87

Peninsula Township to acquire the property of The 81 – with its beautiful bluffs, vistas, and nearly half mile of East Grand Traverse Bay water frontage – for itself – which motivation was not present with other, less desirable SUP projects such as Vineyard Ridge.

170.    By their individual efforts, as well as by cooperating and conspiring together, Defendant YGW and Peninsula Township and GTRLC imposed upon Plaintiff requirements and conditions, purportedly under § 8.1.3(3)(k) of the Peninsula Township Zoning Ordinance, that (1) were not and had never before been required by Peninsula Township or the Ordinance; (2) that were contrary to Judge Rodgers' January 15, 2016 remand order; (3) were the result of Peninsula Township's and YGW's improper desire to take Plaintiff's property away from Plaintiff and secure ownership of that property for Peninsula Township;  (4) were in violation of Plaintiff's rights under the US and Michigan Constitutions, including rights of equal protection. **Moreover, as in the *Advantage Point* case, *supra*, YGW was the "mastermind" of this joint effort and/or plan and/or conspiracy.**

### Count I – Relief Under 42 US § 1983 for Constitutional Violations

171.    Plaintiff restates and realleges, as if fully set forth herein, all preceding paragraphs of these pleadings.

172.    The above acts and omissions of Defendant YGW were under color of state law, including the Michigan Zoning Enabling Act and the Peninsula Township Zoning Ordinance.

173.    These acts and omissions deprived Plaintiff of, and/or violated, one or more of Plaintiff's federal constitutional rights, including without limitation the right of equal protection under the law.

174.    In regard to equal protection, "the Equal Protection Clause 'prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.' *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir.2005)." *Franks v Rubitschun*, 312 Fed Appx 764, 765 (CA 6 2009).

175.    In the case at bar, it is evident that Plaintiff's fundamental rights have been burdened, and that Plaintiff has been intentionally treated differently than others similarly situation without any rational basis for the difference.

176.    Defendant's violations of Plaintiff's federal constitutional rights is the proximate cause of damages, all as set forth above.

177.    Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to recover not only its actual damages, but also punitive damages, where, as here, the Defendant has acted with evil motive or intent, or where the Defendant's actions show reckless disregard or callous indifference for Plaintiff's constitutional rights.  See *Lewis v Downs*, 774 F.2d 711 (6th Cir. 1985).

178.    Pursuant to 42 U.S.C. § 1988(b), Plaintiff is also entitled to recovery of its attorney fees, if it succeeds on a significant issue in litigation that achieves some of the benefit it seeks in bringing suit. *Outdoor Sys, Inc v City of Clawson*, 273 Mich. App. 204, 729 N.W.2d 893 (2006).

### Count II – Civil Conspiracy

179.    Plaintiff restates and realleges, as if fully set forth herein, all preceding paragraphs of these pleadings.

180.    "[T]he essential elements of a civil conspiracy are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose

by unlawful means. *Mays v Three Rivers Rubber Corp*, 135 Mich. App. 42, 48; 352 N.W.2d 339 (1984).

181.    Michigan law regarding conspiracy is clear that it does not require blood oath or solemn ceremony. In *Temborius v Slatkin*, 157 Mich. App. 587, 599–600; 403 N.W.2d 821 (1986), the Michigan Court of Appeals stated "[c]ivil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. The agreement, or preconceived plan, to do the unlawful act is the thing which must be proved. Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact. Furthermore, conspiracy may be established by circumstantial evidence and may be based on inference."

182.    Also, "[a] joint action may be maintained against the conspirators for the damages caused by their wrongful acts, but all the conspirators need not be joined; an action may be maintained against but one. . . [and] the liability of conspirators to civil damages is joint and several, and, a conspiracy being shown prima facie, the plaintiff may give in evidence the acts and sayings of any co-conspirator done or said in furtherance of the common purpose, whether that co-conspirator be a party defendant or not." *Brown v Brown*, 338 Mich. 492, 504; 61 N.W.2d 656, 662 (1953).

183.    And, in *McDonald v Smith*, 139 Mich. 211, 221; 102 N.W. 668 (1905), the Michigan Supreme Court rejected the argument that "defendants were not responsible for false representations, unless made 'by authority of all the defendants,'" holding instead that "[i]f defendants conspired to perpetrate a fraud on plaintiff—and the jury had a right to find that they did—they would be

responsible for false representations made in furtherance of that scheme, though not expressly 'authorized by all the defendants.'"

184.    Specifically in regard to Plaintiff's equal protection claims under §1983, "an otherwise private person acts 'under color of' state law when engaged in a conspiracy with state officials to deprive another of federal rights." *Tower v Glover*, 467 U.S. 914, 920; 104 S. Ct. 2820, 2824; 81 L. Ed. 2d 758 (1984).

185.    And, in *Libertarian Party of Ohio v Husted*, 831 F3d 382, 397 (6th Cir. 2016)(internal citations omitted), the Sixth Circuit, in harmony with the above-cited Michigan precedent, stated:

> Private persons may be held liable under § 1983 if they willfully participate in joint action with state agents. In order to establish a civil conspiracy, the plaintiff must show:
>
> > [A]n agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

186.    The above acts and omissions of Defendant with Peninsula Township and/or GTRLC are a concerted action to accomplish violations and/or deprivations of Plaintiff's Equal protection rights under the Michigan and US Constitutions.

187.    Defendant's conspiracy is the proximate cause of Plaintiff's damages, all as set forth above.

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendant under 42 U.S.C. §1983 for all actual and punitive damages, costs, and attorney fees

allowed by law; and that this Court also award Plaintiff such other and further relief that this Court

deems just and equitable.

## Jury Demand

Pursuant to 28 U.S.C. §1861 and Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of

all issues so triable.

MOOTHART & SARAFA, PLC
Attorneys for Plaintiff


Dated: May 22, 2019          By:  /s/ Jonathan R.  Moothart
Jonathan R. Moothart (P40678)
Moothart & Sarafa, PLC
9815 Miami Beach Rd., P.O. Box 243
Williamsburg, MI 49690
(231) 947-8048
jon@moothartlaw.com